CITY OF NEWPORT ET AL. *v.* FACT CONCERTS, INC.,
ET AL.

No. 80–396.   Argued March 31, 1981—Decided June 26, 1981

248

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 271.

*Guy J. Wells* argued the cause and filed briefs for petitioners.

*Leonard Decof* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed by *John Dekker, James B. Brennan, Henry W. Underhill, Jr., Benjamin L. Brown, Aaron A. Wilson, J. Lamar Shelley, John W. Witt, George F. Knox, Jr., Max P. Zall, Allen G. Schwartz, Lee E. Holt, Burt Pines, Walter M. Powell, Roger F. Cutler, Conrad B. Mattox, Jr., Charles S. Rhyne,* and *William S. Rhyne* for the National Institute of Municipal Law Officers; and by *Edward Cooper* and *James J. Clancy* for the City of Santa Ana.

Briefs of *amici curiae* were filed for the ACLU Foundation, Southern

JUSTICE BLACKMUN delivered the opinion of the Court.

In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), this Court for the first time held that a local government was subject to suit as a "person" within the meaning of 42 U. S. C. § 1983. Aside from concluding that a municipal body was not wholly immune from civil liability, the Court had no occasion to explore the nature or scope of any particular municipal immunity under the statute. 436 U. S., at 701. The question presented by this case is whether a municipality may be held liable for punitive damages under § 1983.

## I

### A

Respondent Fact Concerts, Inc., is a Rhode Island corporation organized for the purpose of promoting musical concerts.[1] In 1975, it received permission from the Rhode Island Depart-

California, et al. by *Fred Okrand* and *Lynette Labinger;* and for the State of Washington et al. by *Kenneth O. Eikenberry,* Attorney General of Washington, *Malachy R. Murphy,* Deputy Attorney General, and *Thomas R. Bjorgen,* Assistant Attorney General; *Charles A. Graddick,* Attorney General of Alabama; *Wilson L. Condon,* Attorney General of Alaska; *Robert K. Corbin,* Attorney General of Arizona; *Carl R. Ajello,* Attorney General of Connecticut; *Tany S. Hong,* Attorney General of Hawaii; *Linley E. Pearson,* Attorney General of Indiana; *Warren R. Spannaus,* Attorney General of Minnesota; *Michael T. Greely,* Attorney General of Montana; *Rufus L. Edmisten,* Attorney General of North Carolina; *Leroy S. Zimmerman,* Attorney General of Pennsylvania; *Dennis J. Roberts II,* Attorney General of Rhode Island; *Mark V. Meierhenry,* Attorney General of South Dakota; *Mark White,* Attorney General of Texas; *John J. Easton,* Attorney General of Vermont; *Chauncey H. Browning,* Attorney General of West Virginia; *John D. Troughton,* Attorney General of Wyoming; *Edward Thompson, Jr.;* and *Ross D. Davis.*

[1] Fact Concerts, Inc., entered into a joint venture with respondent Marvin Lerman, a promoter, to produce the jazz concerts that gave rise to this lawsuit. For convenience, we refer to the corporation as the respondent.

ment of Natural Resources to present several summer concerts at Fort Adams, a state park located in the city of Newport. In securing approval for the final concerts, to be held August 30 and 31, respondent sought and obtained an entertainment license from petitioner city of Newport.[2]   Under their written contract, respondent retained control over the choice of performers and the type of music to be played while the city reserved the right to cancel the license without liability if "in the opinion of the City the interests of public safety demand." App. 27.

Respondent engaged a number of well-known jazz music acts to perform during the final August concerts.   Shortly before the dates specified, the group Blood, Sweat and Tears was hired as a replacement for a previously engaged performer who was unable to appear.   Members of the Newport City Council, including the Mayor, became concerned that Blood, Sweat and Tears, which they characterized as a rock group rather than as a jazz band, would attract a rowdy and undesirable audience to Newport.   2 Record Appendix (R. A.) 265, 316–317, 325.[3]   Based on this concern, the Council attempted to have Blood, Sweat and Tears removed from the program.

On Monday, August 25, Mayor Donnelly informed respondent by telephone that he considered Blood, Sweat and Tears to be a rock group, and that they would not be permitted to perform because the city had experienced crowd disturbances at previous rock concerts.   *Id.*, at 195.   Officials of respondent appeared before the City Council at a special meeting the next day, and explained that Blood, Sweat and Tears in fact were a jazz band that had performed at Carnegie Hall in New York City and at similar symphony hall facilities

---

[2] The individual petitioners are the Mayor of Newport and the other six members of the City Council.   Because their claims are not before us, we refer to the city as petitioner.   See n. 7, *infra*.

[3] Contemporary press accounts attributed to the Council members a "fear of attracting 'long-haired hangers-on.'" 1 R. A. 87–A.

throughout the world. Speaking for the Council, the Mayor reiterated that the city did not condone rock festivals. Without attempting to investigate either the nature of the group's music or the representations made by respondent, the Council voted to cancel the license for both days unless Blood, Sweat and Tears were removed from the program. *Id.*, at 267–269. The vote received considerable publicity, and this adversely affected ticket sales. *Id.*, at 248–G.

Later in the same week, respondent was informed by the City Solicitor that the Council had changed its position and would allow Blood, Sweat and Tears to perform if they did not play rock music. On Thursday, August 28, respondent agreed to attend a second special Council meeting the following day.

The second Council session convened on the afternoon of August 29, the day before the first scheduled performance. Mayor Donnelly informed the Council members that the city had two options—it could either allow Blood, Sweat and Tears to perform subject to the prohibition against rock music, or cancel the concert altogether. Although the City Solicitor advocated the first alternative and advised that cancellation would be unlawful, 3 R. A. 478, the Council did not offer the first option to respondent. Instead, one of the Council members inquired whether all provisions of the contract had been fulfilled. The City Manager, who had just returned from the concert site, reported that the wiring together of the spectator seats was not fully completed by 3 p. m., and that the auxiliary electric generator was not in place. Under the contract, respondent had agreed to fulfill these two conditions as part of the overall safety procedures. App. 28.[4] The

---

[4] Testimony at the trial indicated that in fact substantial compliance had been achieved. *Id.*, at 101–102; 2 R. A. 136–137, 141–142, 201. The Director of the Rhode Island Department of Natural Resources, who also visited the site on Friday afternoon, stated that respondent's preparations were satisfactory for health and safety purposes. *Id.*, at 159. He said that he informed the City Manager that the criticisms offered were

Council then voted to cancel the contract because respondent had not "lived up to all phases" of the agreement. 4 R. A. 10. The Council offered respondent a new contract for the same dates, specifically excluding Blood, Sweat and Tears. Respondent, however, indicated that it would take legal action if the original contract was not honored. 1 R. A. 96; 2 R. A. 202; 4 R. A. 11. After the meeting adjourned at 9:30 p.m., the decision to revoke respondent's license was broadcast extensively over the local media. 1 R. A. 97; 2 R. A. 204.

On Saturday morning, August 30, respondent obtained in state court a restraining order enjoining the Mayor, the City Council, and the city from interfering with the performance of the concerts. The 2-day event, including the appearance of Blood, Sweat and Tears, took place without incident. Fewer than half the available tickets were sold.

## B

Respondent instituted the present action in the United States District Court for the District of Rhode Island, naming the city, its Mayor, and the six other Council members as defendants. Alleging, *inter alia,* that the license cancellation amounted to content-based censorship, and that its constitutional rights to free expression and due process had been violated under color of state law, respondent sought compensatory and punitive damages against the city and its officials under 42 U. S. C. § 1983 and under two pendent state-law counts, including tortious interference with contractual relationships. App. 8. At the conclusion of six days of trial, the District Court charged the jury with respect to the § 1983 and tortious interference counts. Included in its charge was

_____

"picayune," *id.,* at 157 (although this characterization, upon objection, was stricken by the trial judge, *ibid.*), and "frivolous," *id.,* at 179. The Director offered to attend the second Council meeting to assist in any way possible, but was told by the Mayor and the City Manager that he was not needed. *Id.,* at 158.

an instruction, given without objection, that authorized the jury to award punitive damages against each defendant individually, "based on the degree of culpability of the individual defendant." App. 62.[5] The jury returned verdicts for respondent on both counts, awarding compensatory damages of $72,910 and punitive damages of $275,000; of the punitive damages, $75,000 was spread among the seven individual officials and $200,000 was awarded against the city.[6]

Petitioner moved for a new trial, arguing that punitive damages cannot be awarded under § 1983 against a municipality, and that even if they can, the award was excessive.[7] Because petitioner challenged the punitive damages instruction to which it had not objected at trial, the District Court noted that the challenge was untimely under Federal Rule of Civil Procedure 51. But the court was determined not to "rest its decision on this procedural ground alone." App. to Pet. for Cert. B-3. Reasoning that "a careful resolution of this novel question is critical to a just verdict in this case,"

---

[5] See App. 57–58 (instructing on basis for award of punitive damages). Compensatory damages were to be awarded as a single sum against all defendants found liable. Id., at 62.

[6] The jury assessed 75% of the punitive damages upon the § 1983 claim and 25% upon the state-law claim. 3 R. A. 594–595. We do not address the propriety of the punitive damages awarded against petitioner under Rhode Island law.

[7] In addition to challenging the punitive damages award against the city, the defendants sought review of all aspects of the jury verdict as well as numerous rulings made by the District Judge during the trial. Both the District Court and the Court of Appeals determined that respondent had stated valid claims for relief under federal and state law, that the individual defendants were entitled only to qualified good-faith immunity, that respondent had proved its case against each individual defendant, and that objections to the cross-examination of one of the Council members were without merit. Although petitioner sought certiorari on some of these issues, we granted the writ to consider only the question of the availability of punitive damages against a municipality under § 1983. Thus, in all other respects, the findings and conclusions of the lower courts are left undisturbed.

*id.,* at B–7, the court proceeded to consider petitioner's substantive legal arguments on their merits.

The District Court recognized, *ibid.,* that *Monell* had left undecided the question whether municipalities may be held liable for punitive damages. 436 U. S., at 701. The court observed, however, that punitive damages often had been awarded against individual officials in § 1983 actions, and it found no clear basis for distinguishing between individuals and municipalities in this regard. Emphasizing the general deterrent purpose served by punitive damages awards, the court reasoned that a municipality's payment of such an award would focus taxpayer and voter attention upon the entity's malicious conduct, and that this in turn might promote accountability at the next election. App. to Pet. for Cert. B–9. Although noting that the burden imposed upon taxpaying citizens warranted judicial caution in this area, the court concluded that in appropriate circumstances municipalities could be held liable for punitive damages in a § 1983 action.[8]

The United States Court of Appeals for the First Circuit affirmed. 626 F. 2d 1060 (1980). That court noted, as an initial matter, that the challenge to the punitive damages award was flawed due to petitioner's failure to object to the charge at trial. The court observed that such a failure should be overlooked "only where the error is plain and 'has seriously affected the fairness, integrity or public reputation of a judicial proceeding.'" *Id.,* at 1067. The court found none of these factors present, because the law concerning municipal liability under § 1983 was in a state of flux, and no appellate decision had barred punitive damages awards against a municipality.

The Court of Appeals also expressed a belief that the

---

[8] The court, however, went on to rule that the $200,000 award against petitioner was excessive and unjust. App. to Pet. for Cert. B–12 to B–13. It ordered a remittitur, reducing the punitive damages award to $75,000. Respondent accepted the remittitur without objection. App. 68.

challenged instruction might well not have been error at all. 626 F. 2d, at 1067. Citing its own prior holdings to the effect that punitive damages are available against § 1983 defendants, and this Court's recent determination in *Monell* that a municipality is a "person" within the meaning of § 1983, the court identified the "distinct possibility that municipalities, like all other persons subject to suit under § 1983, may be liable for punitive damages in the proper circumstances." 626 F. 2d, at 1067.

Because of the importance of the issue, we granted certiorari. 449 U. S. 1060 (1980).

## II

At the outset, respondent asserts that the punitive damages issue was not properly preserved for review before this Court. Brief for Respondents 7–9. In light of Rule 51's uncompromising language [9] and the policies of fairness and judicial efficiency incorporated therein, respondent claims that petitioner's failure to object to the charge at trial should foreclose any further challenge to that instruction. The problem with respondent's argument is that the District Court in the first instance declined to accept it. Although the punitive damages question perhaps could have been avoided simply by a reliance, under Rule 51, upon petitioner's procedural default,[10] the judge concluded that the interests of justice required careful consideration of this "novel question" of federal law.[11]

---

[9] Rule 51 reads in pertinent part:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

[10] See 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 51.04, n. 3 (1980); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2553 (1971).

[11] The District Judge, after observing that the city had failed to object in timely fashion to the punitive damages instruction, stated: "Despite

Because the District Court reached and fully adjudicated the merits, and the Court of Appeals did not disagree with that adjudication, no interests in fair and effective trial administration advanced by Rule 51 would be served if we refused now to reach the merits ourselves.[12]

Nor are we persuaded that our review should be limited to determining whether "plain error" has been committed, an exception to Rule 51 that is invoked on occasion by the Courts of Appeals absent timely objection in the trial court.[13]   No "right" to a specific standard of review exists in this setting, any more than a "right" to review existed at all once petitioner failed to except to the charge at trial.   But given the special circumstances of this case, limiting our review to a restrictive "plain error" standard would be peculiarly inapt.

"Plain error" review under Rule 51 is suited to correcting obvious instances of injustice or misapplied law.   A court's interpretation of the contours of municipal liability under § 1983, as both courts below recognized, hardly could give rise to plain judicial error since those contours are currently in a state of evolving definition and uncertainty.   See *Owen* v. *City of Independence*, 445 U. S. 622 (1980); *Monell.*   See

---

[petitioner's] tardiness, a careful resolution of this novel question is critical to a just verdict in this case." App. to Pet. for Cert. B-7.   This statement makes clear that that court did not reach the merits merely as an alternative ground for decision or out of an abundance of caution.   The dissent's suggestion to the contrary, *post,* at 273, 276, is simply mistaken.

[12] The District Court may have been influenced by the unusual nature of the instant situation.   Ordinarily, an error in the charge is difficult, if not impossible, to correct without retrial, in light of the jury's general verdict.   In this case, however, we deal with a wholly separable issue of law, on which the jury rendered a special verdict susceptible of rectification without further jury proceedings.

[13] See, *e. g., Morris* v. *Travisono,* 528 F. 2d 856, 859 (CA1 1976); *Williams* v. *City of New York,* 508 F. 2d 356, 362 (CA2 1974); *Troupe* v. *Chicago D. & G. Bay Transit Co.,* 234 F. 2d 253, 259–260 (CA2 1956).   But cf. *Moore* v. *Telfon Communications Corp.,* 589 F. 2d 959, 966 (CA9 1978).

also *Maine* v. *Thiboutot,* 448 U. S. 1 (1980); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn., ante,* p. 1. We undertake review here in order to resolve one element of the uncertainty, that is, the availability of punitive damages, and it would scarcely be appropriate or just to confine our review to determining whether any error that might exist is sufficiently egregious to qualify under Rule 51. The very novelty of the legal issue at stake counsels unconstricted review.

In addition to being novel, the punitive damages question is important and appears likely to recur in § 1983 litigation against municipalities.[14] And here the question was squarely presented and decided on a complete trial record by the court of first resort, was argued by both sides to the Court of Appeals, and has been fully briefed before this Court. In light of all these factors, we conclude that restricting our review to the plain-error standard would serve neither to promote the interests of justice nor to advance efficient judicial administration.[15] We therefore turn to the merits of petitioner's claim.[16]

---

[14] The issue already has arisen on several occasions. Compare *Hild* v. *Bruner,* 496 F. Supp. 93, 99–100 (NJ 1980), and *Flores* v. *Hartford Police Dept.,* 25 FEP Cases 180, 193 (Conn. 1981), with *Edmonds* v. *Dillin,* 485 F. Supp. 722, 729–730 (ND Ohio 1980). See also *Valcourt* v. *Hyland,* 503 F. Supp. 630, 638–640 (Mass. 1980).

[15] The Court's exercise of power in these circumstances is no more broad than its notice of plain error not presented by the parties, see this Court's Rule 34.1 (a); *Washington* v. *Davis,* 426 U. S. 229, 238 (1976); *Silber* v. *United States,* 370 U. S. 717, 718 (1962), or its deciding a question not raised in the lower federal courts, see *Carlson* v. *Green,* 446 U. S. 14, 17, n. 2 (1980), or its review of an issue neither decided below nor presented by the parties, see *Wood* v. *Georgia,* 450 U. S. 261, 265, n. 5 (1981); *Youakim* v. *Miller,* 425 U. S. 231, 234 (1976).

[16] Accordingly, we find it unnecessary to determine whether the Court of Appeals relied exclusively on the plain-error doctrine in affirming the District Court's judgment. While concluding that in this unusual case, the interest of justice warrants our plenary consideration, see 28 U. S. C. § 2106, we express no view regarding the application of the plain-error doctrine by the Courts of Appeals.

## III

It is by now well settled that the tort liability created by § 1983 cannot be understood in a historical vacuum. In the Civil Rights Act of 1871, Congress created a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights. See *Monroe* v. *Pape,* 365 U. S. 167, 172 (1961). Congress, however, expressed no intention to do away with the immunities afforded state officials at common law, and the Court consistently has declined to construe the general language of § 1983 [17] as automatically abolishing such traditional immunities by implication. *Procunier* v. *Navarette,* 434 U. S. 555, 561 (1978); *Imbler* v. *Pachtman,* 424 U. S. 409, 417 (1976); *Pierson* v. *Ray,* 386 U. S. 547, 554–555 (1967); *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951). Instead, the Court has recognized immunities of varying scope applicable to different officials sued under the statute.[18] One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary.

At the same time, the Court's willingness to recognize certain traditional immunities as affirmative defenses has not led it to conclude that Congress incorporated *all* immunities exist-

---

[17] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Rev. Stat. § 1979, 42 U. S. C. § 1983.

[18] *E. g., Imbler* v. *Pachtman,* 424 U. S. 409 (1976) (state prosecutor); *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974) (state executive); *Pierson* v. *Ray,* 386 U. S. 547 (1967) (state judge); *Tenney* v. *Brandhove,* 341 U. S. 367 (1951) (state legislator).

ing at common law. See *Scheuer* v. *Rhodes,* 416 U. S. 232, 243 (1974). Indeed, because the 1871 Act was designed to expose state and local officials to a new form of liability, it would defeat the promise of the statute to recognize any preexisting immunity without determining both the policies that it serves and its compatibility with the purposes of § 1983. See *Imbler* v. *Pachtman,* 424 U. S., at 424; *id.,* at 434 (opinion concurring in judgment); *Owen* v. *City of Independence,* 445 U. S., at 638. Only after careful inquiry into considerations of both history and policy has the Court construed § 1983 to incorporate a particular immunity defense.

Since *Monell* was decided three years ago, the Court has applied this two-part approach when scrutinizing a claim of immunity proffered by a municipality. In *Owen* v. *City of Independence,* the Court held that neither history nor policy supported a construction of § 1983 that would allow a municipality to assert the good faith of its officers or agents as a defense to liability for damages. 445 U. S., at 638, 657. *Owen,* however, concerned only compensatory damages, and petitioner contends that with respect to a municipality's liability for punitive damages, an examination of the common-law background and policy considerations yields a very different result.

## A

By the time Congress enacted what is now § 1983, the immunity of a municipal corporation from punitive damages at common law was not open to serious question. It was generally understood by 1871 that a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity,[19] but this understand-

---

[19] Local units of government initially were shielded from tort liability by the doctrine of sovereign immunity. *Russell* v. *Men of Devon,* 2 T. R. 667, 100 Eng. Rep. 359 (K. B. 1788). See F. Burdick, Law of Torts § 21 (4th ed. 1926). Subsequently, the municipal entity was bifurcated, for purposes of immunity, into sovereign and proprietary spheres of conduct. *Bailey* v. *Mayor of New York,* 3 Hill 531 (N. Y. Sup. Ct. 1842), aff'd, 2

ing did not extend to the award of punitive or exemplary damages. Indeed, the courts that had considered the issue prior to 1871 were virtually unanimous in denying such damages against a municipal corporation. *E. g., Woodman* v. *Nottingham,* 49 N. H. 387 (1870); *City of Chicago* v. *Langlass,* 52 Ill. 256 (1869); *City Council of Montgomery* v. *Gilmer & Taylor,* 33 Ala. 116 (1858); *Order of Hermits of St. Augustine* v. *County of Philadelphia,* 4 Clark 120, Brightly N. P. 116 (Pa. 1847); *McGary* v. *President & Council of the City of Lafayette,* 12 Rob. 668, 674 (La. 1846).[20] Judicial disinclination to award punitive damages against a municipality has persisted to the present day in the vast majority of jurisdictions.[21] See generally 18 E. McQuillin, Municipal Corporations § 53.18a (3d rev. ed. 1977); F. Burdick, Law of Torts 245–246 (4th ed.

---

Denio 433 (1845). See W. Williams, Liability of Municipal Corporations for Tort § 4 (1901). See generally *Owen,* 445 U. S., at 640–650; *Monell,* 436 U. S., at 687–689.

[20] Although occasionally courts have suggested in dictum that punitive damages might be awarded in appropriate circumstances, see *Wallace* v. *Mayor, etc., of New York,* 18 How. 169, 176 (N. Y. Com. Pl. 1859); *Herfurth* v. *Corporation of Washington,* 6 D. C. 288, 293 (1868), we have been directed to only one reported decision prior to 1871 in which an award of punitive damages against a municipality was upheld, and that decision was expressly overruled in 1870. *Whipple* v. *Walpole,* 10 N. H. 130, 132–133 (1839), overruled by *Woodman* v. *Nottingham,* 49 N. H. 387, 394 (1870).

[21] *E. g., Lauer* v. *Young Men's Christian Assn. of Honolulu,* 57 Haw. 390, 557 P. 2d 1334 (1976); *Ranells* v. *City of Cleveland,* 41 Ohio St. 2d 1, 321 N. E. 2d 885 (1975); *Smith* v. *District of Columbia,* 336 A. 2d 831 (D. C. App. 1975); *Fisher* v. *City of Miami,* 172 So. 2d 455 (Fla. 1965); *Brown* v. *Village of Deming,* 56 N. M. 302, 243 P. 2d 609 (1952); *Town of Newton* v. *Wilson,* 128 Miss. 726, 91 So. 419 (1922); *Willett* v. *Village of St. Albans,* 69 Vt. 330, 38 A. 72 (1897). See Annot., 19 A. L. R. 2d 903–920 (1951); 57 Am. Jur. 2d, Municipal, School, and State Tort Liability §§ 318, 319 (1971). The general rule today is that no punitive damages are allowed unless expressly authorized by statute. 18 E. McQuillin, Municipal Corporations § 53.18a (3d rev. ed. 1977); Hines, Municipal Liability for Exemplary Damages, 15 Clev.-Mar. L. Rev. 304 (1966).

1926); 4 J. Dillon, Law of Municipal Corporations § 1712 (5th ed. 1911); G. Field, Law of Damages § 80 (1876).

The language of the opinions themselves is instructive as to the reasons behind this common-law tradition. In *McGary*, for example, the Louisiana Supreme Court refused to allow punitive damages against the city of Lafayette despite the malicious acts of its municipal officers, who had violated an injunction by ordering the demolition of plaintiff's house. Reasoning that the officials' malice should not be attributed to the taxpaying citizens of the community, the court explained its holding:

> "Those who violate the laws of their country, disregard the authority of courts of justice, and wantonly inflict injuries, certainly become thereby obnoxious to vindictive damages. These, however, can never be allowed against the innocent. Those which the plaintiff has recovered in the present case . . . , being evidently vindictive, cannot, in our opinion, be sanctioned by this court, as they are to be borne by widows, orphans, aged men and women, and strangers, who, admitting that they must repair the injury inflicted by the Mayor on the plaintiff, cannot be bound beyond that amount, which will be sufficient for her indemnification." 12 Rob., at 677.

Similarly, in *Hunt* v. *City of Boonville*, 65 Mo. 620 (1877), the Missouri Supreme Court held that a municipality could not be found liable for treble damages under a trespass statute, notwithstanding the statute's authorization of such damages against "any person." After noting the existence of "respectable authority" to the effect that municipal corporations "can not, as such, do a criminal act or a willful and malicious wrong and they cannot therefore be made liable for exemplary damages," *id.*, at 624, the court continued:

> "[T]he relation which the officers of a municipal corporation sustain toward the citizens thereof for whom they act, is not in all respects identical with that existing be-

tween the stockholders of a private corporation and their agents; and there is not the same reason for holding municipal corporations, engaged in the performance of acts for the public benefit, liable for the willful or malicious acts of its officers, as there is in the case of private corporations." *Id.*, at 625.

Of particular relevance to our current inquiry is *Order of Hermits of St. Augustine* v. *County of Philadelphia, supra,* which involved a Pennsylvania statute that authorized property owners within the county to bring damages actions against it for the destruction of their property by mob violence.[22] The court observed that the "persons" against whom the statute authorized recovery included the county corporation, and it held that plaintiffs were entitled to compensatory damages as part of the county's duty to make reparation to its citizens for injuries sustained as a result of lawless violence. While noting that punitive damages would have been available against the rioters themselves, the court nonetheless held that such exemplary damages were not recoverable against the county.

The rationale of these decisions was reiterated in numerous other common-law jurisdictions. *E. g., Wilson* v. *City of Wheeling,* 19 W. Va. 323, 350 (1882) ("The city is not a spoliator and should not be visited by vindictive or punitive damages"); *City of Chicago* v. *Langlass,* 52 Ill., at 259 ("But in fixing the compensation the jury have no right to give vindictive or punitive damages, against a municipal corporation. Against such a body they should only be compensatory, and not by way of punishment"); *City Council of Montgomery* v. *Gilmer & Taylor,* 33 Ala., at 132 ("The [municipal] corporation can not, upon any principle known

---

[22] This statute is strikingly similar to the Sherman amendment to the Civil Rights Act of 1871, discussed *infra.* See Cong. Globe, 42d Cong., 1st Sess., 663, 749, 755 (1871) (Globe). The Pennsylvania statute was cited as a model during the legislative debates. *Id.*, at 777 (Sen. Frelinghuysen).

to us, be responsible for the malice of its officers towards the plaintiffs"). In general, courts viewed punitive damages as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised. The courts readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vindictive damages appropriate as punishment for the bad-faith conduct of those same officers and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment, and the municipalities from undue fiscal constraints.[23]

Given that municipal immunity from punitive damages was well established at common law by 1871, we proceed on the familiar assumption that "Congress would have specifically so provided had it wished to abolish the doctrine." *Pierson* v. *Ray,* 386 U. S., at 555. Nothing in the legislative debates suggests that, in enacting § 1 of the Civil Rights Act,

---

[23] In the face of this history, respondent acknowledged at oral argument that in 1871 the common law did not contemplate the imposition of punitive damages against municipalities, but contended that the functional equivalent was achieved through the *respondeat superior* liability to which municipalities were, and still are, exposed. Tr. of Oral Arg. 29. Apparently, respondent argues that because municipalities were liable for the conduct of their agents, including conduct over which their executive officials had no actual responsibility or knowledge, it would have been unnecessary to expose them to punitive damages with regard to the same conduct. This argument, however, does not alter the persuasiveness of the prevalent common-law immunity; if anything, it goes to the soundness of the common-law defense at that time and now. Moreover, the *respondeat superior* doctrine did not cover all instances in which the municipality could assert immunity in its own capacity. *E. g., City Council of Montgomery* v. *Gilmer & Taylor; McGary* v. *President & Council of Lafayette.* See G. Field, Law of Damages § 80 (1876) ("[Municipal corporations] cannot, as such, be supposed capable of doing a criminal act, or a willful and malicious wrong, and therefore cannot be liable for exemplary damages . . .").

the 42d Congress intended any such abolition. Indeed, the limited legislative history relevant to this issue suggests the opposite.

Because there was virtually no debate on § 1 of the Act, the Court has looked to Congress' treatment of the amendment to the Act introduced by Senator Sherman as indicative of congressional attitudes toward the nature and scope of municipal liability. *Monell,* 436 U. S., at 692, n. 57.[24] Initially, it is significant that the Sherman amendment as proposed contemplated the award of no more than compensatory damages for injuries inflicted by mob violence. The amendment would not have exposed municipal governments to punitive damages; rather, it proposed that municipalities "shall be liable *to pay full compensation* to the person or persons damnified" by mob violence. Globe, at 749, 755 (emphasis added).[25]

---

[24] The legislative background of § 1983 is exhaustively addressed in *Monell,* 436 U. S., at 664–695. Briefly, the Sherman amendment was a proposed addition to the statute, and was defended by its sponsor as an attempt to enlist the aid of persons of property in suppressing the lawless violence of the Ku Klux Klan. See Globe, at 760–761. In its initial form, the amendment imposed liability on *any* inhabitant of a municipality for damage inflicted by persons "riotously and tumultuously assembled." *Id.,* at 663. That version was passed by the Senate but overwhelmingly rejected by the House. *Id.,* at 704–705, 725. A first conference substitute was then proposed. *Id.,* at 749, 755. The substitute version placed liability directly on the local government, regardless of whether the municipality had had notice of the impending riot, had made reasonable efforts to stop it, or was even authorized under state law to exercise police power. See *Monell,* 436 U. S., at 668. The conference substitute also created a lien which ran against "all moneys in the treasury," thus permitting execution against public property such as jails and courthouses. It was generally understood that the extent of the proposed public liability went beyond what was contemplated under § 1. After much debate, the amendment passed the Senate but was again rejected by the House. Globe, at 779, 800–801. It is from the debate over the first conference substitute that we glean "clue[s]" as to Congress' views on municipal liability. *Monell,* 436 U. S., at 692, n. 57.

[25] The same language appears in the original version of the amendment,

That the exclusion of punitive damages was no oversight was confirmed by Representative Butler, one of the amendment's chief supporters, when he responded to a critical inquiry on the floor of the House:

> "The invalidity of the gentleman's argument is that he looks upon [the amendment] as a punishment for the county. Now, we do not look upon it as a punishment at all. It is a mutual insurance. We are there a community, and if there is any wrong done by our community, or by the inhabitants of our community, we will indemnify the injured party for that wrong . . . ." *Id.,* at 792.

We doubt that a Congress having no intention of permitting punitive awards against municipalities in the explicit context of the Sherman amendment would have meant to expose municipal bodies to such novel liability *sub silentio* under § 1 of the Act.

Notwithstanding the compensatory focus of the amendment, its proposed extension of municipal liability met substantial resistance in Congress, resulting in its defeat on two separate occasions.[26] In addition to the constitutional reservations broached by legislators, which the Court has discussed at some length in *Monell,* 436 U. S., at 669–683, Members of both Chambers also expressed more practical objections. Notably, supporters as well as opponents of § 1 voiced concern that this extension of public liability might place an unmanageable financial burden on local governments.[27] Legislators

Globe, at 663, although there it was the inhabitants and not the government that were made liable. See n. 24, *supra.*

[26] See *ibid.* In its final version, the amendment abandoned all specific references to municipal liability. Globe, at 804. See *Monell,* 436 U. S., at 668–669. See generally, Avins, The Ku Klux Klan Act of 1871: Some Reflected Light on State Action and the Fourteenth Amendment, 11 St. Louis U. L. J. 331, 368–376 (1967).

[27] Representative Blair, a strong proponent of § 1, argued that the obligations imposed by the amendment might "utterly destroy the munic-

also expressed apprehension that innocent taxpayers would be unfairly punished for the deeds of persons over whom they had neither knowledge nor control.[28]   Admittedly, both these objections were raised with particular reference to the threat of the expansive municipal liability embodied in the Sherman amendment.   The two concerns are not without relevance to the present inquiry, however, in that they reflect policy considerations similar to those relied upon by the common-law courts in rejecting punitive damages awards.   We see no reason to believe that Congress' opposition to punishing innocent taxpayers and bankrupting local governments would have been less applicable with regard to the novel specter of punitive damages against municipalities.

### B

Finding no evidence that Congress intended to disturb the settled common-law immunity, we now must determine whether considerations of public policy dictate a contrary result.   In doing so, we examine the objectives underlying punitive damages in general, and their relationship to the goals of § 1983.

Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor

---

ipality."  Globe, at 795.  Representative Bingham, who had drafted § 1 of the Fourteenth Amendment, feared that the burden upon the local treasury under the Sherman amendment would "deprive the county of the means of administering justice."  *Id.,* at 798.  See also *id.,* at 762 (Sen. Stevenson) ; *id.,* at 763–764 (Sen. Casserly) ; *id.,* at 772 (Sen. Thurman) ; *id.,* at 789 (Rep. Kerr).

[28] Senator Stevenson declared that the amendment "undertakes to create a corporate liability for personal injury which no prudence or foresight could have prevented."  *Id.,* at 762.  Senator Frelinghuysen objected to the proposed liability, observing that "the town or the county has committed no crime."  *Id.,* at 777.  Representatives Poland and Willard also referred to the injustice of such liability, *id.,* at 791 (Rep. Willard) ; *id.,* at 794 (Rep. Poland).  See also *id.,* at 771 (Sen. Thurman) ; *id.,* at 775 (Sen. Bayard) ; *id.,* at 788 (Rep. Kerr).

whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct. See Restatement (Second) of Torts § 908 (1979); W. Prosser, Law of Torts 9–10 (4th ed. 1971). Regarding retribution, it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. Thus, there is no question here of equitably distributing the losses resulting from official misconduct. Cf. *Owen* v. *City of Independence*, 445 U. S., at 657. Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.[29]

Under ordinary principles of retribution, it is the wrongdoer himself who is made to suffer for his unlawful conduct. If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments. See generally *Silver* v. *Cormier*, 529 F. 2d 161, 163 (CA10 1976); *Bucher* v. *Krause*, 200 F. 2d 576, 586–588 (CA7 1952), cert. denied, 345 U. S. 997 (1953). A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for *punitive* purposes, therefore, are not sensibly assessed against the governmental entity itself.

To the extent that the purposes of § 1983 have any bearing on this punitive rationale, they do not alter our analysis. The Court previously has indicated that punitive damages

---

[29] It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. Nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

might be awarded in appropriate circumstances in order to punish violations of constitutional rights, *Carey* v. *Piphus,* 435 U. S. 247, 257, n. 11 (1978), but it never has suggested that punishment is as prominent a purpose under the statute as are compensation and deterrence. See, *e. g., Owen* v. *City of Independence,* 445 U. S., at 651; *Robertson* v. *Wegmann,* 436 U. S. 584, 590–591 (1978); *Carey* v. *Piphus,* 435 U. S., at 256–257. Whatever its weight, the retributive purpose is not significantly advanced, if it is advanced at all, by exposing municipalities to punitive damages.

The other major objective of punitive damages awards is to prevent future misconduct. Respondent argues vigorously that deterrence is a primary purpose of § 1983, and that because punitive awards against municipalities for the malicious conduct of their policymaking officials will induce voters to condemn official misconduct through the electoral process, the threat of such awards will deter future constitutional violations. Brief for Respondents 9–11. Respondent is correct in asserting that the deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983. *Owen* v. *City of Independence,* 445 U. S., at 651; *Robertson* v. *Wegmann,* 436 U. S., at 591. It is in this context that the Court's prior statements contemplating punitive damages "in 'a proper' § 1983 action" should be understood. *Carlson* v. *Green,* 446 U. S. 14, 22 (1980); *Carey* v. *Piphus,* 435 U. S., at 257, n. 11. For several reasons, however, we conclude that the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities.

First, it is far from clear that municipal officials, including those at the policymaking level, would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality. Indemnification may not be available to the municipality under local law, and even if it were, officials likely will not be able themselves to pay such sizable awards. Thus, assum-

ing, *arguendo,* that the responsible official is not impervious to shame and humiliation, the impact on the individual tort-feasor of this deterrence in the air is at best uncertain.

There also is no reason to suppose that corrective action, such as the discharge of offending officials who were appointed and the public excoriation of those who were elected, will not occur unless punitive damages are awarded against the municipality. The Court recently observed in a related context: "The more reasonable assumption is that responsible superiors are motivated not only by concern for the public fisc but also by concern for the Government's integrity." *Carlson* v. *Green,* 446 U. S., at 21. This assumption is no less applicable to the electorate at large. And if additional protection is needed, the compensatory damages that are available against a municipality may themselves induce the public to vote the wrongdoers out of office.

Moreover, there is available a more effective means of deterrence. By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations.[30] In our view, this provides sufficient protection against the prospect that a public official may

---

[30] A number of state statutes requiring municipal corporations to indemnify their employees for adverse judgments rendered as a result of performance of governmental duties specifically exclude indemnification for malicious or willful misconduct by the employees. *E. g.,* N. Y. Gen. Mun. Law § 50–k (3) (McKinney Supp. 1980–1981); Pa. Stat. Ann., Tit. 42, § 8550 (Purdon Supp. 1981); Cal. Gov't Code Ann. § 825 (West 1980); Conn. Gen. Stat. § 7–465 (1981); Nev. Rev. Stat. § 41.0349 (1979). See *Karas* v. *Snell,* 11 Ill. 2d 233, 142 N. E. 2d 46 (1957). See generally *Messersmith* v. *American Fidelity Co.,* 232 N. Y. 161, 165, 133 N. E. 432, 433 (1921) (Cardozo, J.) ("[N]o one shall be permitted to take advantage of his own wrong . . ."). Commentators have encouraged this development. See G. Calabresi, The Costs of Accidents 269–270 (student ed. 1970); Project, Suing the Police in Federal Court, 88 Yale L. J. 780, 818 (1979).

commit recurrent constitutional violations by reason of his office. The Court previously has found, with respect to such violations, that a damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer. *Carlson* v. *Green,* 446 U. S., at 21. We see no reason to depart from that conclusion here, especially since the imposition of additional penalties would most likely fall upon the citizen-taxpayer.

Finally, although the benefits associated with awarding punitive damages against municipalities under § 1983 are of doubtful character, the costs may be very real. In light of the Court's decision last Term in *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), the § 1983 damages remedy may now be available for violations of federal statutory as well as constitutional law. But cf. *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn., ante,* p. 1. Under this expanded liability, municipalities and other units of state and local government face the possibility of having to assure compensation for persons harmed by abuses of governmental authority covering a large range of activity in everyday life. To add the burden of exposure for the malicious conduct of individual government employees may create a serious risk to the financial integrity of these governmental entities.

The Court has remarked elsewhere on the broad discretion traditionally accorded to juries in assessing the amount of punitive damages. *Electrical Workers* v. *Foust,* 442 U. S. 42, 50–51 (1979); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 349–350 (1974). Because evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded,[31] the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. The impact of such a windfall recovery is likely to be both un-

---

[31] See Restatement (Second) of Torts § 908 (2) (1979); D. Dobbs, Law of Remedies § 3.9, pp. 218–219 (1973).

predictable and, at times, substantial, and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large.[32]  Absent a compelling reason for approving such an award, not present here, we deem it unwise to inflict the risk.

## IV

In sum, we find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials.  Because absolute immunity from such damages obtained at common law and was undisturbed by the 42d Congress, and because that immunity is compatible with both the purposes of § 1983 and general principles of public policy, we hold that a municipality is immune from punitive damages under 42 U. S. C. § 1983. Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

The Court today considers and decides a challenge to the District Court's jury instructions, even though petitioners failed to object to the instructions in a timely manner, as required by Rule 51 of the Federal Rules of Civil Procedure. Because this departure from Rule 51 is unprecedented and unwarranted, I respectfully dissent.

Respondents filed suit against petitioners in Federal District Court under 42 U. S. C. § 1983, alleging violations of their

---

[32] The case at bar appears to be an example of undue and substantial impact, since the jury award of $200,000 was more than twice the total amount of punitive damages assessed against all the defendant city officials individually.  In reducing the award, the District Judge said that this verdict "is excessive, against the weight of the evidence, and fails to comport with substantial justice," and that it "was both unreasonable and devoid of firm support in the record."  App. to Pet. for Cert. B-10.

First Amendment rights. In their complaint and amended complaint, respondents prayed for punitive damages, as well as other relief. App. 11, 12, 13, 24, 25, 26. Respondents submitted a pretrial memorandum on the issue of punitive damages and, during trial, submitted an additional memorandum on the availability of punitive damages against a municipal corporation, in response to the court's request to both parties. Brief in Opposition 8. At the close of the evidence, the court instructed the jury explicitly and in detail that it could impose punitive damages against petitioners if they had acted maliciously, wantonly, or oppressively. App. 57–58. After giving the instruction, the Court summoned the attorneys to the side bar, inviting objections or suggestions concerning the instructions. Record Appendix (R. A.) 591–A to 591–B. For reasons not revealed in the record, counsel for petitioners expressly declined to make any such objection or suggestion.[1] *Id.*, at 591–B. The jury returned a verdict in favor of respondents, and awarded substantial punitive damages against each of the petitioners, including the city of Newport.

Petitioners moved for judgment notwithstanding the verdict, and for a new trial, arguing, *inter alia*, that punitive damages may not be imposed against a municipality under § 1983. The court denied the motion, stating:

> "None of these legal arguments were ever raised at trial. In fact, the defendants failed to request that any of their current legal interpretations be inserted into the jury instructions and never objected to any aspect of that charge before or after the jury retired. . . . Therefore, defendants' untimely objections are not the proper basis for this post-trial motion." App. to Pet. for Cert. B–2 to B–3 (citing Fed. Rule Civ. Proc. 51).

Petitioners' failure to object to the punitive damages instruc-

---

[1] In contrast, counsel for respondents made two objections to the instructions, which the Court indicated it would consider before the jury retired. R. A. 591–A to 591–B.

tion thus precluded them from raising the issue on post-trial motions. Not content to "rest its decision on this procedural ground *alone*," *id.*, at B–3 (emphasis added), however, the court also held, in the alternative, that its punitive damages instruction was correct on the merits. *Id.*, at B–7 to B–10.

On appeal to the Court of Appeals for the First Circuit, the court stated that petitioners' allegation of error in the punitive damages instruction

"is flawed by the failure to object to the charge at trial. *See* Fed. R. Civ. P. 51. We may overlook a failure of this nature, but only where the error is plain and 'has seriously affected the fairness, integrity or public reputation of a judicial proceeding.'" 626 F. 2d 1060, 1067 (1980), quoting *Morris* v. *Travisono,* 528 F. 2d 856, 859 (CA1 1976) (footnote and citation omitted).

The Court of Appeals then briefly canvassed the relevant precedents, stated that the law concerning punitive damages against municipalities under § 1983 is in a "state of flux," 626 F. 2d, at 1067, and concluded: "[W]e would be hard-pressed to say that the trial judge's punitive damages instruction was plain error. Nor is this a case containing such 'peculiar circumstances [to warrant, noticing error] to prevent a clear miscarriage of justice.'" *Id.*, at 1067–1068, quoting *Nimrod* v. *Sylvester,* 369 F. 2d 870, 873 (CA1 1966) (citation omitted; brackets in original).

Respondents argue before this Court that the decision of the Court of Appeals should be affirmed, because petitioners failed to object to the punitive damages instruction.[2] They

---

[2] Respondents also argue, on the merits, that the punitive damages instruction was correct. Because I conclude that the Court of Appeals should be affirmed on a procedural ground, I need not consider this additional argument, except to observe that the Court's treatment of it may well reflect the absence of full consideration of the punitive damages question by the court below.

The Court thus relies on 19th-century case law for the proposition that municipalities may not be held liable for punitive damages, without dis-

rely on Federal Rule of Civil Procedure 51, which states in relevant part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict."

Rule 51 could not be expressed more clearly. Cases too numerous to list have held that failure to object to proposed jury instructions in a timely manner in accordance with Rule 51 precludes appellate review.[3] Rule 51 serves an important function in ensuring orderly judicial administration and fairness to the parties. The trial judge is thereby informed in precise terms of any objections to proposed instructions, and thus is given "an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge." *Marshall* v. *Nugent*, 222 F. 2d 604, 615 (CA1 1955). Moreover, the Rule prevents litigants from making the tactical decision not to object to instructions at trial in order to preserve a ground for appeal. In light of the significant purposes and "uncompromising language," *ante*, at 255, of Rule 51, courts should not depart lightly from its strictures.

Nevertheless, like other procedural rules, Rule 51 is susceptible to flexible interpretation when strictly necessary to

tinguishing between the common situation in which municipal liability is predicated on a theory of *respondeat superior*, and the more unusual situation in which the violation is committed in accordance with official governmental policy. See *ante*, at 259–263. Only in the latter situation have we held that a municipality may be sued under § 1983, *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 690–691 (1978). It is in the latter context that the Court's cited precedent is least relevant, and that its concern for "blameless or unknowing taxpayers," *ante*, at 267, is least compelling. Indeed, when the elected representatives of the people adopt a municipal policy that violates the Constitution, it seems perfectly reasonable to impose punitive damages on those ultimately responsible for the policy—the citizens.

[3] See, *e. g.*, cases cited in 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 51.04, pp. 51–9 to 51–18, n. 3 (1980); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2553, p. 639, nn. 51–52 (1971).

avoid a clear miscarriage of justice. Cf. *Wood* v. *Georgia*, 450 U. S. 261, 265, n. 5 (1981); *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980); *Hormel* v. *Helvering*, 312 U. S. 552, 557 (1941).[4] Accordingly, the Courts of Appeals have developed a "plain error" doctrine to deal with certain unchallenged jury instructions so contrary to law as to be manifestly unjust. Whatever the proper scope of such a doctrine,[5] courts and commentators uniformly agree that it should be applied only in exceptional circumstances. As the Court of Appeals for the First Circuit has noted: " 'If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings.' " *Morris* v. *Travisono, supra*, at 859, quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558, p. 675 (1971). This was the standard applied by the Court of Appeals below. 626 F. 2d, at 1067.

The Court states that the "problem with" respondents' argument that petitioners are barred from raising the punitive damages issue "is that the District Court in the first in-

---

[4] This Court has considered issues not raised in the courts below only in "exceptional cases or particular circumstances . . . where injustice might otherwise result." *Hormel* v. *Helvering*, 312 U. S., at 557. Thus, in *Wood* v. *Georgia* the issue of attorney conflict-of-interest could scarcely have been raised by the attorney whose conflict was under challenge. 450 U. S., at 265, n. 5. In *Carlson* v. *Green*, both parties consented to waiver of the procedural default, and the issue was closely related to the other main question in the case. Thus, fairness to the parties and sound judicial administration were promoted by the Court's decision to reach the issue. 446 U. S., at 17, n. 2.

[5] The Court declines to express any opinion on the plain-error doctrine as it has been applied by the Court of Appeals. *Ante*, at 257, n. 16. It is difficult to understand how the Court can purport to avoid this question, when it vacates a judgment predicated squarely on that doctrine. Nevertheless, I will join with the Court in leaving open the issue of the scope of exceptions to Rule 51, if any, to another day. For the purpose of this opinion, it is sufficient to conclude that exceptions to Rule 51 are no broader than those recognized by the Court of Appeals.

stance declined to accept it." *Ante,* at 255. But the District Court did not reject respondents' argument; on the contrary, it expressly held that petitioners' objections to the jury instructions were "untimely" under Rule 51, and therefore were "not the proper basis" for post-trial challenge. App. to Pet. for Cert. B–3. Its prudential decision to discuss the merits as well does not detract from this holding.[6] As the Court of Appeals held, this procedural ground is sufficient to compel affirmance in the absence of a finding of plain error constituting manifest injustice. Petitioners themselves admit that the punitive damages question may be reviewed only under a plain-error standard. Brief for Petitioners 27.

The Court today frankly admits that the instruction was not plain error, noting that the governing principles of law are "currently in a state of evolving definition and uncertainty." *Ante,* at 256. Nevertheless, it vacates the Court of Appeals' judgment. Such a vacating *necessarily implies* that the Court of Appeals' treatment of the procedural question was in error, but the Court provides not a hint as to what standard the Court of Appeals should have applied.[7] Indeed, the Court

---

[6] It is not uncommon for courts to reach the merits as an alternative ground for decision on an issue otherwise unreviewable under Rule 51, either out of an excess of caution or as part of a plain-error inquiry. See, *e. g., Kropp* v. *Ziebarth,* 601 F. 2d 1348, 1355–1356 (CA8 1979); *Mid-America Food Service, Inc.* v. *ARA Services, Inc.,* 578 F. 2d 691, 695–700 (CA8 1978); *Bilancia* v. *General Motors Corp.,* 538 F. 2d 621, 623 (CA4 1976). Surely the Court does not mean to suggest that a party may obtain appellate review of an unchallenged jury instruction merely because the court offered such alternative grounds for decision.

[7] In effect, without defining or explaining it, the Court has carved out an expansive exception to the requirements of Rule 51. I suspect that the Court has not considered the broad repercussions of its treatment of the procedural default in this case, or the incongruity of its result in light of parallel procedural requirements in the criminal area. The Federal Rules of Criminal Procedure, which contain a provision—similar to Rule 51—that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider

does not even state in so many words that the Court of Appeals erred, much less explain why.

The Court does assert that under the "special circumstances of this case" it would be "peculiarly inapt" to confine our review to the plain-error standard employed below. It explains that the issue in this case is "novel," and that it "appears likely to recur." *Ante,* at 256, 257. But *most* of the issues before this Court are novel and likely to recur: that is why they are considered worthy of certiorari. And to the extent issues are novel, it behooves us to grant certiorari in cases where there has been full consideration of the issues by the courts below, rather than cursory treatment under a plain-error standard.

The Court also suggests that this case is somehow "special" because the issue "was squarely presented and decided on a complete record by the court of first resort, was argued by both sides to the Court of Appeals, and has been fully briefed before this Court." *Ante,* at 257. But these factors are present whenever the District Court reconsiders unchallenged jury instructions on the merits as an alternative holding, the

its verdict," Fed. Rule Crim. Proc. 30, also contain another provision: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed. Rule Crim. Proc. 52 (b). The absence of a similar provision in the Civil Rules suggests that review of unchallenged jury instructions is intended to be more restrictive under the Civil than under the Criminal Rules. The Court's conclusion that petitioners' claim in this civil case should be heard despite the absence of plain error thus inverts the Rules, in violation of their spirit as well as their letter.

Similarly, certain procedural defaults in state and federal criminal trials preclude federal habeas relief in the absence of "cause" and "prejudice." See *Wainwright* v. *Sykes,* 433 U. S. 72, 90–91 (1977); *Davis* v. *United States,* 411 U. S. 233, 242–245 (1973). The Court's conclusion that petitioners' claim should be heard despite the absence of any claim of "cause" and "prejudice" thus suggests that the courts should be stricter in enforcing procedural rules against prisoners facing incarceration than against civil defendants facing money judgments. The Court's priorities seem backwards to me.

Court of Appeals affirms on a plain-error standard, and this Court grants certiorari. See n. 6, *supra*. In short, I see the circumstances of this case as anything but "special."

Applying settled principles, I conclude that the Court of Appeals was correct to affirm the District Court in this case. The jury instruction, as the Court admits, did not constitute "plain error." Moreover, as the Court of Appeals held, failure to review the instruction would not cause a clear miscarriage of justice, any more than would failure to review any other unchallenged jury instruction. There is no reason to treat punitive damages instructions differently from other instructions for Rule 51 purposes. See *Whiting* v. *Jackson State University*, 616 F. 2d 116, 126–127 (CA5 1980) (no timely objection having been made, court's failure to give punitive damages instruction upheld except in exceptional cases); *Mid-America Food Service, Inc.* v. *ARA Services, Inc.*, 578 F. 2d 691 (CA8 1978) (no timely objection having been made, punitive damages instruction upheld in absence of plain error). Nor is the city of Newport entitled to special treatment by virtue of its governmental status. Cf. *Morris* v. *Travisono*, 528 F. 2d, at 859 (failure of state correctional officers in § 1983 suit to object to jury instructions not excused, even though the instructions directed the jury to apply a harsher constitutional standard than had been established by precedent).

Indeed, I consider this a peculiarly *inapt* case to disregard petitioners' procedural default. There would be no injustice whatsoever in adhering to the Rule in this case. Petitioners were given clear notice that punitive damages would be an issue in the case; the jury instructions were unambiguous; petitioners had ample opportunity to object; they failed to do so, without offering any reason or excuse.[8] Whether their

---

[8] Petitioners have apparently abandoned their argument that the lack of a developed legal doctrine on municipal liability under § 1983 "mitigates the error" of their trial counsel. Pet. for Cert. 9.

default was negligent or tactical, they have no cause now to complain. If these petitioners' default is to be excused, whose should not? If Rule 51 is to be disregarded in this case, when should it be enforced?

I dissent.