**243 P.2d 609**

**BROWN v. VILLAGE OF DEMING.**

**No. 5458.**

Supreme Court of New Mexico.

April 23, 1952.

Bert E. Newland, John F. Schaber, Deming, J. R. Wrinkle, Silver City, for appellant and cross-appellee.

Sherman & Hughes, Deming, Garland & Sanders, Las Cruces, for appellee and cross-appellant.

McGHEE, Justice.

This is the first case we have had where a plaintiff has availed himself of the provisions of Rule 18(a), 1941 Comp. § 19–101, and joined in a complaint a count for damages occasioned by a breach of warranty and another for tort. May the repose of the souls of Blackstone, Kent, Chitty, Sutherland and Bliss be not too long disturbed by what has happened here.

The Count for Breach of Warranty

In 1948 the defendant purchased a large amount of pipe from the War Assets Administration then in the ground at the United States Army Air Base at Deming,

under rules and regulations of such agency allowing a 40% discount of the approved price to municipalities when such materials were to be used in the furtherance of the public health. The pipe was used in the operation of water and gas systems at the air base. The defendant represented such material would be used in extending its municipally owned water and gas systems and that it would not be sold for a period of five years. The material parts of the bill of sale from the War Assets Administration read:

"Know All Men By These Presents, That United States of America, acting by and through War Assets Administrator, under and pursuant to Reorganization Plan One of 1947 (12 Fed. Reg. 4534) and the powers and authority contained in the provisions of the Surplus Property Act of 1944 (58 Stat. 765) as amended [50 U.S.C.A.Appendix, § 1611 et seq.], and War Assets Administration Regulation No. 1, as amended, and applicable rules, regulations and orders, in consideration of the sum of Eighty-seven Hundred Three and 24/100 ($8,703.24) Dollars, to the War Assets Administrator paid by Village of Deming, New Mexico, a municipality, the receipt of which is hereby acknowledged, does by these presents bargain, sell, grant and convey without warranty, express or implied, unto the said Village of Deming, New Mexico, its successors and assigns, the described property in Schedule "A" hereto attached and by this reference made a part hereof.

"The aforesaid property was duly declared surplus and was assigned to the War Assets Administrator for disposal acting pursuant to the Surplus Property Act of 1944, as amended, and applicable rules, regulations and orders.

"The Purchaser, by the acceptance of this Bill of Sale, agrees as follows:

\* \* \* \* \* \*

"Sixth: The property applied for will be used solely for health purposes in connection with the further extension and development of the present municipally owned and operated water and gas systems of said municipality, and said applied uses are more fully set forth in Schedule "A", hereto attached and by this reference made a part hereof.

"Seventh: The property will not be sold or otherwise conveyed for a period of five (5) years, except that it may be replaced by permanent facilities serving the same purpose.

"Eighth: Semi-annual reports certifying compliance with the program for which discount was allowed will be filed with the War Assets Administration, or its successor in function,

during the five-year period following conveyance.

"Ninth: That all of said extensions of water and gas systems will be installed within the corporate limits of said Village of Deming, New Mexico.

"Tenth: The revenue derived from the sale of water and gas will be used solely for the maintenance and operation of the systems, and for normal reserves for cost retirement.

\* \* \* \* \* \*

"Thirteenth: The Purchaser warrants that no person has been employed to solicit or secure this Bill of Sale upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warranty shall give the Government the right to annul the Bill of Sale, or at its option to recover from the Purchaser the amount of such commission, percentage, brokerage or contingent fee in addition to the consideration herein set forth. This warranty shall not apply to commissions payable by the Purchaser upon the Bill of Sale secured or made by bona fide established commercial agencies maintained by the Purchaser for the purpose of doing business. 'Bona fide established commercial agencies' have been construed to include licensed real estate brokers engaged in the business generally."

Shortly after the purchase of the pipe the defendant advertised it for sale, and the plaintiff, on December 16, 1948, purchased it for the sum of $30,000 and was given a bill of sale therefor which it is agreed warranted the title.

On or about December 23, 1948, the plaintiff began removing the pipe from the air base and one week later he was told by someone connected with the defendant it did not have the right to sell the pipe under its agreement with the War Assets Administration. He then sent the following telegram to such administration:

"Wire collect whether the Village of Deming owns all of the pipe at the Deming Air Base and whether said pipe is eligible to resale to private concern."

In response to this inquiry he received the following telegram:

"Answering your wire of December 30. Materials composing underground water facilities and gas distribution system at Deming Air Base are not eligible for resale to private concern. See our air mail letter to you of even date. (Sgd) Stansbury Thompson Dep Reg Dir Real property."

The plaintiff then received the following letter from the War Assets Administration, dated December 31, 1948:

"Dear Mr. Brown:

"Answering your wire of December 30, 1948, regarding the Village of Deming's ownership of the underground water facilities and gas distribution system at the Deming Army Air Base.

"The Village of Deming purchased the materials in the two systems at public benefit discount under a contract providing that all of the material should be incorporated into their municipal systems. These materials cannot be sold by the Village of Deming without specific permission, and to date such permission has not been granted.

"The Mayor has been asked to provide us with additional information as to this proposed sale so that a determination can be made as to the present status of these materials. After receipt of the information requested from the Mayor, a report will be made to our Washington office and a determination will then be made.

"Yours very truly,
"(sd) Stansbury Thompson
"Office of Real Property Disposal"

Upon receipt of the above letter the plaintiff gave the defendant written notice he was shutting down his removal operation of the pipe until the War Assets Administration gave him authority to continue his work, and that he would bill the defendant for the expense of the shutdown time. The plaintiff later appeared before the Board of Trustees of the defendant village on several occasions and advised its members he would hold the defendant accountable for all loss or damage sustained by him pending an adjustment with the War Assets Administration. Each time the plaintiff was told by the board members they had sold him the pipe in good faith, that he should go ahead with his removal operations and they would stand behind him.

Representatives of the War Assets Administration met with the defendant's Board of Trustees and other officials and the plaintiff on January 19, 1949, for the purpose of discussing the sale of the pipe by the defendant to the plaintiff. The Regional Director of the War Assets Administration offered to sanction the sale provided sufficient advertising of the sale could be shown by the defendant and that it would return all profits from the sale to the Treasury of the United States. The defendant accepted the proposition and paid the United States the difference between what had already been paid and the sale price to the plaintiff of $30,000, or an additional sum of approximately $22,000, so that the War Assets Administration received the full sum of $30,000 for the pipe.

This offer which the defendant accepted was one of three made to it by the Regional Director, and it was required that a supplemental agreement be entered into. The de-

fendant was advised by wire the supplemental agreement would be mailed to Deming about February 15, 1949, and it was finally signed by the Regional Director on February 24, 1949. In it the defendant was required to make the following admissions:

"1. That the pipe purchased was to be used solely for the further extension and development of the Village's municipally-owned and operated water and gas systems;

"2. That the Offer to Purchase was submitted by the municipality and was accepted subject to certain terms and conditions set forth in said acceptance;

"3. That a public benefit allowance for health purposes was made of 40 percent, and that the Bill of Sale was executed under certain terms and conditions as set forth in the Bill of Sale;

"4. That the municipality was specifically forbidden to transfer or use said property for any purpose other than the extension and development of the water and gas systems;

"5. That the procedure followed by the municipality was contrary to both the spirit and the letter of the Surplus Property Act of 1944, as amended, and to pertinent rules and regulations of the War Assets Administration;

"6. That the Government was required under the law to declare the sale by the municipality to H. P. Brown as null and void unless the money received therefrom, over and above the money already paid by the municipality be remitted to the Treasurer of the United States; * * *."

The plaintiff resumed his work of removing the pipe about March 1, 1949. He testified at the trial and submitted other evidence that the value of the pipe as of December, 1948, was $66,721; that the used pipe market had dropped 40% from December, 1948, to March, 1949; that the actual cost and expense to remove the pipe was $125 per day for 30 days and his actual loss of profits was approximately $22,000. The jury returned a verdict on this count in favor of the plaintiff for the sum of $13,500.

It will be remembered the regulations of the War Assets Administration for the sale of surplus property under which the sale involved was made, and the statute authorizing such sale, 58 Stat. 765, as amended, was by law written into the bill of sale which the village received. The statute reads in part as follows:

"Sec. 26. (b) Every person who shall use or engage in or cause to be used or engaged in any fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any payment, property, or other benefits from the United States or any Govern-

ment agency in connection with the disposition of property under this Act; or who enters into an agreement, combination, or conspiracy to do any of the foregoing—

\* \* \* \* \* \*

"(3) shall, if the United States shall so elect, restore to the United States the property thus secured and obtained and the United States shall retain as liquidated damages any consideration given to the United States or any Government agency for such property."

War Assets Administration Regulation 5, as amended July 30, 1948, 13 F.R. 4741, Sec. 8305.17; 44 CFR (1949 Ed.) 52, Sec. 403.17, reads as follows:

"*Disposal for educational or public-health purposes.* State or local governments or educational or public-health institutions seeking to acquire surplus real property hereunder for educational use or to promote or protect the public health may qualify for an allowance from the fair value because of the benefit which has accrued or which may accrue to the United States by such use: *Provided,* That no public-benefit allowance may be allowed to any non-profit institutions which are not exempt from taxation under section 101(6) of the Internal Revenue Code. Applications for such allowances shall be filed with the Administration and shall indi-

cate with reasonable completeness the nature of the contemplated use of the property, the basis for claiming preferential treatment, a full description of the applicant, and a statement of the ways in which and the extent to which the United States will be benefited by the proposed use. Each such application shall be accompanied by a certificate of an authorized official of the applicant that the applicant is a State or local government, or that it is a non-profit educational or public-health institution as defined in Sec. 8305.1(b) of this part, and that the property is being acquired for educational or public-health purposes. After considering the application and any other additional evidence deemed appropriate, the Administration shall determine the eligibility of the applicant and if found to be qualified shall compute the public-benefit allowance to be granted, if any, in accordance with the criteria contained in Exhibit B hereto, and shall certify the amount of the public-benefit allowance granted and direct the terms and conditions of the disposal."

The Exhibit B referred to, 13 F.R. 4746, 44 CFR 65 (1949 Ed.), so far as pertinent reads as follows:

"\* \* \* (b) Water distribution systems and salable portions of such facilities, including pumping equip-

ment, purifiers, reservoirs, and disposition mains, when disposed of for use off-site, are subject to the public-benefit allowance of forty percent (40%).

*"Provided,* The applicant in any such case meets all required specifications and furnishes the certificate and appropriate evidence of tax-exemption, if necessary, *and provided further,* That such applicant includes in its certificate the following certifications:

"(a)  That it is an instrumentality of a local government or a non-profit institution, tax-exempt under section 101 (6) of the Internal Revenue Code;

"(b)  That the building (facilities) applied for will be used solely for specified health or education purposes;

"(c)  That the building (facilities) will not be sold or otherwise conveyed for a period of five (5) years, except that they may be replaced by permanent facilities serving the same purpose;

"(d)  That semi-annual reports certifying compliance with the program for which public-benefit allowance was granted will be filed with the War Assets Administration or successor agency during the five-year period following conveyance;

"(e)  That the facilities are being acquired for use in a specified area or areas where a measurable health hazard exists;

"(f)  That the revenues to be derived from use of the system of which the facilities transferred will be a part, shall be limited to operating costs and normal reserves;

"(g)  That fifty-one percent (51%) or more of the capacity of the facility will be used for other than industrial purposes; and furnishes in support of such certification a program showing in detail the manner in which the facilities are to be utilized."

The regulations set out above and the United States Statutes on the subject had the force of law and were an integral part of the contract, and were notice to all who dealt in such property. The defendant realized it could not sell this pipe without the consent of its vendor, and prior to the sale to the plaintiff asked such permission of a responsible official in the Denver office. At the trial the defendant's officials testified such consent was given over the telephone. This was denied by such official and the jurors must have believed his testimony on the subject as they found for the plaintiff notwithstanding an instruction that if they found such consent had been given their verdict would be for the defendant.

The defendant relies upon the following points for a reversal of the judgment on the first cause of action:

1.  That there was no breach of implied warranty of title by defendant.

2. It was error for the trial court to submit the construction of the contract to the jury.

3. The evidence did not warrant the submission of the case to the jury and there is not substantial evidence to support the verdict.

We will now consider the questions raised by the defendant under its point 1. We quote from its brief:

"The plaintiff contends that by stopping his operations of removal of the pipe at the suggestion of the War Assets Administration he surrendered to the request of that agency, which, he contends, held a paramount title, and the burden is upon the plaintiff to prove that the War Assets Administration had a title paramount to that held by the plaintiff. This is the general rule in all jurisdictions."

What was the situation in which the plaintiff found himself? His vendor had purchased the pipe for a fraction of its value from the government on condition it be used for health purposes for a term of five years, except for replacement, with a provision it would not be sold during that time, under the statute cited above which provided the property could be repossessed by the government if this provision was violated, the government to retain all money theretofore paid by the purchaser. The statute itself is referred to in the bill of sale to the defendant and, as heretofore stated, was as much a part thereof as if incorporated therein in full. It was to prevent just what happened here that the statute was passed—that is, the purchase of war surplus goods at a heavy discount by public agencies and their resale at a large profit. The defendant had only a conditional title for five years, which could be wiped out at the option of the government if sold without its consent within that time. The plaintiff could not have successfully urged he was an innocent purchaser for value, and therefore entitled to keep the pipe sold to him by the defendant in the face of the statute and regulations adopted thereunder by the War Assets Administration of which he was bound to take notice.

The bill of sale is clear and explicit in its terms but even if there were basis for construction of it by us, no relief would be afforded to the defendant for we would be bound to a liberal construction in favor of the government. Colorado Tel. Co. v. Fields, 15 N.M. 431, 110 P. 571, 30 L.R.A., N.S., 1088; 12 Am.Jur., Contracts, § 254, p. 798.

The questions raised by the defendant under its first point are without merit.

The trial court left to the determination of the jury the question of whether the bills of sale from the War Assets Administration to the defendant and from defendant to the plaintiff conveyed good

312

title to the pipe, but the defendant is in no position to complain of the action of the trial court in that respect in view of its failure to object to such submission. Its only exceptions to the instructions were two in number and they were based on the claim the burden of proof was improperly placed upon the defendant upon two questions, but error on that account is not claimed here. In addition, such claimed error by the court becomes immaterial as the jury correctly decided the questions. This point is also ruled against the defendant.

█ It is further claimed the evidence did not warrant the submission of the case to the jury and that there is not substantial evidence to support the verdict, and finally, that when the pipe was uncovered it was found it was not usable in the water and gas systems, and therefore it was decided to sell it and purchase new pipe with the proceeds. Defendant maintains such would not have been a violation of its contract with the War Assets Administration. We cannot accept this contention. The government owned the pipe and it was entitled to a compliance on the part of the purchaser who made the purchase of its own volition. As heretofore stated, the jury found the issue of consent against the defendant. It was bound by its contract with the governmental agency and the applicable regulations and statute and it could not, without the consent of its vendor, deviate therefrom.

There is ample substantial evidence to sustain the verdict and the judgment on the first count will be affirmed.

The Action for Malicious Prosecution

A count for malicious prosecution was included in Brown's complaint against the village. A dispute arose rather early between Brown and the defendant as to whether certain 6¼ inch O.D. steel pipe in an irrigation line used for carrying water from the sewer plant to a field on the airport property was included in the bill of sale to Brown. After all other pipe had been removed, the plaintiff, Brown, notified the village by letter dated July 12, 1949, that he would commence recovery of a claimed shortage of pipe from the irrigation line, unless stopped by court order before July 14, 1949, which pipe he claimed under the bill of sale referred to in the opinion on the first count, and which he had been prevented from removing by the defendant. On July 26, 1949, the defendant village filed an action for a declaratory judgment to determine the ownership of the pipe in dispute. No judgment having been rendered in such action, Brown notified the defendant in the early part of September that he was going to remove such irrigation line and he was then called to a meeting of the village trustees in the office

of its attorney, at which all members of the board were present. The trustees there threatened Brown with arrest if he was caught on the air base. Later Brown removed three joints of such pipe and he was arrested by a Deputy Sheriff on a warrant charging him with grand larceny which had been issued on a complaint signed by the village attorney on instructions of the Board of Trustees. Brown made bond and was given a preliminary hearing before a justice of the peace and at such hearing he was discharged after several witnesses were heard and the village attorney had admitted the ownership of the pipe was in dispute. Later an injunction was obtained by the village restraining Brown from removing any of the disputed pipe.

There was testimony that the arrest was followed by much newspaper publicity, with resulting embarrassment to Brown; that his credit was injured and he was subjected to ridicule and that, in addition, he had to pay an attorney a fee.

The jury returned a verdict on this count in favor of Brown and awarded him compensatory damages in the sum of $2,500 and exemplary or punitive damages in the sum of $5,000.

Following the return of the verdict the defendant village filed a motion for judgment notwithstanding the verdict, which, so far as it relates to the malicious prosecution charge, reads in substance as follows:

1. The defendant is not liable for malicious prosecution as alleged in plaintiff's complaint and under the evidence submitted in support thereof.

2. That defendant is not liable for exemplary damages.

3. That the damages are excessive and not warranted by the evidence.

4. That under the evidence submitted, and under the law, the plaintiff is not entitled to recover on his count for malicious prosecution.

5. That all of the reasons listed in defendant's motion for a directed verdict at the close of all of the testimony are hereby renewed.

The substance of such motion for a directed verdict on the count under consideration was: Failure to prove lack of probable cause and failure to prove malice; that a municipality is not liable for malicious prosecution in such an action filed by its attorney acting in an official capacity; and, finally, that it was not liable in exemplary damages.

The trial judge sustained the motion relating to the malicious prosecution count, set aside the verdict and rendered judgment in favor of the defendant, without giving any reasons therefor or specifying the particular paragraphs or grounds he held good. Rather than delay a decision here we have considered all grounds of such motion,

but take advantage of the occasion to suggest the District Judges hereafter state the grounds upon which they sustain such a motion, if more than one ground be stated.

Counsel on each side have been diligent in their research and have cited many cases from other jurisdictions in support of their respective claims. We have read all cited cases and many more, but, except for the question of exemplary damages, we find the answer to the legal questions in our own statute, Sec. 14–1611, N.M.S.A., 1941 Comp. Laws 1905, Ch. 67, Sec. 1, and our decisions. Baca v. City of Albuquerque, 19 N. M. 472, 145 P. 110; Taylor v. City of Roswell, 48 N.M. 209, 147 P.2d 814; and Hughes v. Van Bruggen, 44 N.M. 534, 105 P.2d 494.

■ Section 14–1611, supra, reads:

"No personal action shall be maintained in any court of this state against any member or officer of any municipal corporation in this state for any tort or act done, or attempted to be done, by such member or officer, when done by authority of such municipal corporation, or in execution of the orders thereof; in all such cases the municipal corporation shall alone be responsible; and any such member or officer may plead the provisions of this section in bar of such action whether the same be now pending or hereafter commenced."

No one can question the statement that a municipality was not liable at common law for the torts of its agents in the performance of a governmental function, but by this statute the Legislature has, if we give its words their ordinary meaning, removed the common law immunity in part by a general act making the remedy available to all, and making a municipality liable for the torts of its agents when done by its authority or direction. Such was the construction given the section by this court in the Baca case. The court there said in a negligence action where Baca was injured by a city fire wagon en route to a fire:

"Appellant admits that under the common law he could not maintain this action against the city, but he contends that the above quoted statute (Sec. 14–1611, supra) makes the city liable, in all cases and under all circumstances, for any tortious act done by a city official or employe, when such officer or employe is acting in his official capacity for such city. In other words, it is his contention that the above statute takes away his remedy against the city employe driving the wagon in question, and makes the city liable to him for the acts of such driver in this case. We do not believe the language of the statute justifies such construction. The act says the member or officer shall not be liable for any tort or act done or attempted to be done by

such member of officer, 'when done by authority of such municipal corporation or in execution of the orders thereof.' This, we think, exempts the member or officer from liability, and casts the same upon the city only in those cases where the tortious act was done by authority, or in execution of the orders of the municipal corporation. For illustration, suppose the city council should instruct the chief of police to tear down a building, or to close a ditch, and pursuant to such order he should do so. In such a case the statute says he shall not be individually liable for such act, but that the liability shall rest upon the city. The city authorizes the closing of a street, and under such authority the marshal proceeds to do so. The marshal would not be liable, as he acted under the authority of the city, but the city would be liable under the statute, if damages were recoverable. The statute does not undertake to change the common-law rule, except in those cases where the specific tortious act was done under direction of the city, or by its authority."

We quoted the Baca case with approval in Taylor v. City of Roswell, supra, where the city had been sued because of an assault made upon Taylor by a policeman while making an arrest in the presence and with the approval of a member of the city council. It was there attempted to hold the city liable because of the presence of the councilman. It is there stated:

"Appellee City acts by authority of its governing board, not through any one member, and there is nothing to show that in this case the council was itself acting or authorizing any such act. We need not say what would have been the result had the entire council, the governing body, witnessed and 'approved' the alleged assault. That inquiry is not presented. We believe the question is settled by the case of Baca v. City of Albuquerque, 19 N.M. 472, 145 P. 110."

The judgment of the lower court dismissing the complaint against the city was affirmed.

Much is said in the briefs about whether the defendant village was acting in a governmental or proprietary capacity in instituting the prosecution, the defendant contending it was acting in a governmental capacity and as an agent of the state in enforcing its criminal statute when it caused the complaint to be filed. We are, however, unable to see where the capacity in which it was acting makes any difference under the statute and our decisions heretofore cited.

A claim of good faith on the part of the trustees in ordering the arrest and prosecution of Brown for grand larceny cannot seriously be contended for under the facts shown by the record. Larceny

is the felonious stealing and carrying away of the personal property of another, and a necessary element is that the property was lost by the felonious taking. State v. Curry, 32 N.M. 219, 252 P. 994. Webster's International Dictionary defines "felonious" as "malicious, villainous, wicked, traitorous, perfidious; in law * * * done with intent to commit a crime." A widely accepted instruction to juries of the meaning of "feloniously" as used in informations and indictments in New Mexico is that the act was done wrongfully and wickedly, and that the accused, if convicted, may be punished by imprisonment in the penitentiary. Grand larceny is a felony in this state.

It is uncontroverted there was a bona fide dispute between the defendant village and Brown, the former claiming title to the irrigation pipe did not pass under the bill of sale, and the latter claiming it did. It is a matter of common knowledge that one who is going to commit larceny does not announce to the owner he is going to steal his property at a certain time, and then openly commit the act in broad daylight in a public place. It was later adjudged in a civil action the defendant was the owner of the pipe in dispute, but Brown's act was conversion—not larceny.

The jury was instructed without objection on the question of malice and lack of probable cause, as well as the good faith of the officials of the village in directing the institution of the prosecution, and it found against the defendant on all points.

It is true, as was stated in Hughes v. Van Bruggen, supra, that what constitutes probable cause is a question of law for the trial court to determine, but the parties did not object to the submission of this question to the jury, and it is now too late to complain of the failure of the court in this respect. The defendant suggests that perhaps the trial court determined there were not sufficient facts shown to establish the lack of probable cause, but, if so, we disagree with such view. The evidence abundantly supports the verdict on all points if exemplary damages are proper in this case.

It is the general rule, supported by the great weight of authority, that absent a statute so providing, exemplary or punitive damages may not be awarded against a municipality. Desforge v. West St. Paul, 231 Minn. 205, 42 N.W.2d 633, 19 A.L.R.2d 898, and annotation following at page 903. The reason for the rule is that such damages are awarded by way of punishment of the guilty party, and to grant against a municipality would be to penalize the taxpayers who had no part in the commission of the tort. We do not have a statute authorizing such damages, and believing the majority rule to be sound will follow it.

The defendant also contends its attorney would have been immune from liability for instituting the prosecution of Brown under the apparently universal rule that a prosecuting attorney may not be made to answer for the malicious institution, without probable cause, of a criminal case as stated in Vol. 3 Restatement of the Law of Torts, Sec. 656. This action, however, is not against the attorney but against the village whose trustees ordered the prosecution. To hold with the village on this point we would have to ignore the plain terms of Sec. 14–1611, supra.

In Hughes v. Van Bruggen, supra, we joined the ranks of the many courts who do not look with favor upon malicious prosecution suits, but there the citizen who signed the complaint on instructions from the district attorney had actually had property stolen from him, and the court did not go to the extent of saying such an action could not be maintained under proper facts, such as we have present in this case.

It was error to submit the issue of exemplary damages to the jury, and the trial court acted correctly when it granted judgment n. o. v. on that item, but it erred when it set aside the verdict for the actual damages and also rendered judgment on that item in favor of the defendant.

We do not agree with the defendant's contention that the compensatory damages were excessive under the facts shown in the record.

The judgment on the first cause of action for breach of warranty is sustained, but so much of it as denied the plaintiff judgment on the verdict for $2,500 on the third count for actual damages is reversed, and the cause will be remanded with instructions to enter judgment in accordance with the views herein expressed. The clerk will tax the costs of this appeal against the defendant.

It is so ordered.

LUJAN, C. J., and SADLER, COMPTON, and COORS, JJ., concur.