830 P.2d 145

**TORRANCE COUNTY MENTAL HEALTH PROGRAM, INC.,**
Plaintiff–Appellee,

v.

**NEW MEXICO HEALTH AND EN-VIRONMENT DEPARTMENT,**
Defendant–Appellant.

No. 19272.

Supreme Court of New Mexico.

April 13, 1992.
Rehearing Denied May 15, 1992.

Jerry Dickinson, Clifford M. Rees, Geoffrey Sloan, Special Asst. Attys. Gen., Santa Fe, for defendant-appellant.

Ray Twohig, Albuquerque, for plaintiff-appellee.

William H. Carpenter, Michael B. Browde, Albuquerque, for amicus curiae New Mexico Trial Lawyers Ass'n.

## OPINION

MONTGOMERY, Justice.

In this case we answer the question whether punitive damages may be recovered from a governmental entity in an action for breach of contract. We also consider two other damage issues arising under the particular facts in the case and the evidence at trial: whether damages for the plaintiff corporation's "loss in value" caused by the defendant's breach of contract were properly awarded, and whether the plaintiff could recover damages for its employees' efforts in winding up the contract after defendant terminated it.

The first issue is obviously the major one on this appeal. On that issue, we hold that the state's policy of not permitting assessment of punitive damages in tort cases, as reflected in our Tort Claims Act, applies also, despite legislative silence on the issue, to breach-of-contract cases. On the other two issues, we hold that, while damages for loss in value might in a proper case be recovered from the breaching party, the evidence in this case did not warrant submission of the claim to the jury; and that the jury properly awarded damages for the employees' efforts in winding up the contract. We therefore reverse the judgment as to all but the winding-up damages and remand with instructions to enter a new judgment.

## I.

Plaintiff Torrance County Mental Health Program, Inc. (TCMHP), is a nonprofit corporation organized to provide mental health and related counseling services in Torrance County, New Mexico. In 1978, defendant New Mexico Health and Environment Department (HED) first contracted with TCMHP to provide specified mental health counseling services in Torrance County. After a series of annual contract renewals, the parties executed a contract for the fiscal year beginning July 1, 1981, and in August of that year amended the contract to authorize TCMHP to provide expanded service to residents of adjacent Valencia County. The contract sum payable to TCMHP in the amended contract was $161,468 for services in both counties.

The contract allowed HED to conduct site visits at TCMHP's offices to monitor the contractor's performance. On September 21-23, 1981, the program manager of HED's Mental Health Bureau, Alfredo Santistevan, conducted a site visit at TCMHP's Torrance and Valencia County offices. He determined, according to HED's version of the facts, that TCMHP had been providing treatment that did not qualify as mental health treatment under the contract and that was therefore unauthorized. He summarized his findings in a report, based upon which HED asserted that TCMHP was guilty of "serious misuse of funds," justifying termination of the contract for cause. The contract provided for termination with or without cause. Termination without cause required thirty days written notice; termination for cause permitted termination without prior notice, with "cause" defined as "client abuse, malpractice, fraud, embezzlement or other serious misuse of funds." Based on Santistevan's site report and HED's evaluation of the program, HED terminated the contract effective December 15, 1981, and directed TCMHP to engage in post-termination activities.[1]

TCMHP's version of the facts, which of course we view in the light most favorable to support the jury's verdict, was that HED terminated the contract as the result of a conspiracy among Santistevan, Robert Garcia (then director of the Behavioral Health Services Division at HED), possibly other

---

1. The "termination management" provision of the contract required compliance with all directives of HED regarding performance of work in the event of termination.

HED officials, and Sam Vigil. Vigil had been hired by TCMHP's executive director, Madeline Brito–Diaz, and had, according to TCMHP, insinuated himself into a position of power at TCMHP and subsequently assumed executive director-like duties at TCMHP's post-August 1981 program in Valencia County, Valencia Counseling Services Program ("Valencia Counseling"). Valencia Counseling was incorporated with a separate board of directors sometime after HED terminated TCMHP's contract and was subsequently expanded to provide mental-health and related services in three counties. By the time of trial in 1990, it had acquired total assets of $1.5 million. Vigil served as its executive director during all or most of this period.

According to TCMHP (although this is impossible to know, for reasons we shall shortly describe), Vigil conspired and connived with Santistevan and Garcia and others to achieve a position of dominance in the Valencia County program, and HED's termination of the contract occurred as part of the scheme to transfer control of both the Valencia and Torrance County programs to Vigil and withdraw them from TCMHP's management.

TCMHP brought this action against HED in September 1982. As originally filed, the suit sought relief by way of mandamus, injunction, and damages for breach of contract, fraud, and civil rights violations. Nine individuals (consisting of various employees, clients, and members of the board of directors of TCMHP) joined TCMHP as plaintiffs, and three individuals (including Santistevan, Garcia, and George Goldstein, then Secretary of HED) were named along with HED as defendants. In 1985, TCMHP filed an amended complaint, seeking damages for breach of contract, fraudulent and negligent misrepresentation, infliction of emotional distress, and violation of civil rights. Shortly before trial, the claims on behalf of all individual plaintiffs and the claims against all individual defendants were disposed of, either by

settlement or by rulings on summary judgment, so that there remained for trial only the claim by TCMHP against HED for breach of contract.

After having been assigned to six different judges, the case was finally ready, more or less, for trial in the spring of 1990. On March 20 of that year, the court entered a pretrial order, specifying, in more detail than had the amended complaint, the nature of the claims of the then plaintiffs (which still consisted of the individuals in addition to TCMHP). The pretrial order, however, did not particularize the nature or extent of the plaintiffs' alleged damages, except that TCMHP's contract claim was asserted to be for "contract damages for work performed from December 15, 1981 through the end of the contract year, June 30, 1982 * * *."

The individual plaintiffs were dismissed as parties to the action following entry of the pretrial order and before commencement of the trial. On the morning of the first day of trial, TCMHP moved to amend the pretrial order to assert claims for damages which, TCMHP's new counsel alleged, had been overlooked by its former counsel in preparing the pretrial order, although new counsel maintained they had been asserted in the amended complaint.[2] The claims sought to be included in the pretrial order by TCMHP's motion to amend were a claim for punitive damages "in the approximate amount of $100,000," a claim for TCMHP's destruction as an operating entity in the mental health field "in the approximate amount of $100,000," and a claim for carrying out its obligations after termination of the contract "in the approximate amount of $26,640.00." The court granted the motion at the beginning of the second day of trial.

The case went to the jury after four days of trial. As to HED's alleged breach of contract, the court instructed the jury simply that TCMHP claimed that HED had breached the contract "by terminating it

---

2. The amended complaint sought punitive damages, although this relief was related to plaintiffs' claims (in 1985) for misrepresentation, intentional infliction of emotional distress, viola-

tion of civil rights, and other assorted torts. The amended complaint asserted no claim for TCMHP's alleged loss in value as a result of HED's breach of contract.

'for serious misuse of funds' which was not true," that HED denied it breached the contract and alleged it had good cause for terminating the contract, and that each party had the burden of proving its claim or defense. Thus, on the record we are called on to review, we know that the jury (assuming it followed the court's instructions) found that HED had breached the contract by terminating it for a reason that was not true and that HED did not have good cause for the termination. We do not know whether or to what extent the jury believed TCMHP's elaborate conspiracy theory—although the size of the punitive damage award, $1.5 million, suggests that the jury gave considerable credence to TCMHP's argument that HED had performed a "hatchet job" and had imposed a "death penalty" on TCMHP, for which it should be made to pay. The court did instruct the jury that it was a breach of contractual duty for a party to act in bad faith—*i.e.*, not to act "honestly under the surrounding circumstances and in accordance with reasonable standards of fair dealing." The court further instructed the jury that it could award punitive damages if it found that HED's acts were reckless or grossly negligent or done in bad faith. The jury returned its verdict in favor of TCMHP, awarding punitive damages of $1,500,000; loss of the corporation's pecuniary value in the amount of $250,000; loss of profits of $0; and damages for reimbursement of five former employees or board members aggregating $27,000 for their services in winding up the contract ("termination management" damages)—for a total award of $1,777,000.

On appeal, HED asserts that the trial court erred: (1) in amending the pretrial order to permit TCMHP to raise new damage claims not previously asserted; (2) and (3) in submitting the claims for compensatory and punitive damages to the jury; and (4) in making erroneous rulings during the trial and giving the jury erroneous instructions. In light of our rulings on what we consider to be the dispositive issues on the appeal—the recoverability of punitive damages and the sufficiency of the evidence supporting the compensatory damage

claims—we need not reach (except tangentially in connection with the claim for termination management damages) the issues of whether the trial court abused its discretion in amending the pretrial order at the beginning of the trial and whether the court erred in the various ways claimed in HED's catch-all argument under its fourth point of error. The damages issues are the critical ones on this appeal, because HED does not seriously contest the propriety of the jury's determination that it breached the contract. One sentence in its brief in chief asserts that this determination was not supported by substantial evidence, but the assertion is unaccompanied by transcript references or argument, and we take it as virtually conceded that the jury permissibly determined that HED had improperly terminated the contract. Whether punitive damages are recoverable for this breach, and what compensatory damages could be awarded on the evidence submitted to the jury, constitute the controlling issues on this appeal. We turn now to those issues.

## II.

■ Citing *Brown v. Village of Deming,* 56 N.M. 302, 243 P.2d 609 (1952), and *Rascoe v. Town of Farmington,* 62 N.M. 51, 304 P.2d 575 (1956), HED contends that the law in New Mexico does not permit an award of punitive damages against a governmental entity absent a statute expressly authorizing such an award. In *Brown,* we said:

It is the general rule, supported by the great weight of authority, that absent a statute so providing, exemplary or punitive damages may not be awarded against a municipality. The reason for the rule is that such damages are awarded by way of punishment of the guilty party, and to grant against a municipality would be to penalize the taxpayers who had no part in the commission of the tort. We do not have a statute authorizing such damages, and believing the majority rule to be sound will follow it.

56 N.M. at 316, 243 P.2d at 618 (citations omitted).

In *Rascoe*, we cited *Brown* as support for the following statement: "Exemplary damages ordinarily are not allowable against a municipality in the absence of a statute so authorizing and we have none." 62 N.M. at 55, 304 P.2d at 577.

TCMHP, assisted by an excellent brief filed by the New Mexico Trial Lawyers Association as amicus curiae, responds, first, that these cases were actions in tort against a municipality, not actions for breach of contract against the state, and, more importantly, to the extent they were based on the theory of sovereign immunity, were overruled in *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975). Neither *Brown* nor *Rascoe* referred to the doctrine of sovereign immunity, but we assume for purposes of discussion that the theoretical underpinning for the proposition that a governmental entity is not liable for punitive damages was the concept of sovereign immunity. The holding in *Hicks*, of course, was that the common law defense of sovereign immunity for claims in *tort* against the state would no longer (absent statutory authorization) be available, but we agree with TCMHP that the case generally abolished the common law doctrine of sovereign immunity in all its ramifications, whether in tort or contract or otherwise, except as implemented by statute or as might otherwise be interposed by judicial decision for sound policy reasons.

Nevertheless, we cannot agree with TCMHP that *Hicks*'s sweeping abolition of sovereign immunity carried away all defenses of governmental entities, based on their role as state-created entities, regardless of the nature of the claims asserted or the relief sought. *See, e.g., Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 179, 793 P.2d 855, 861 (1990) (claim against state for restitution, based on unjust enrichment, barred by sovereign immunity as reinstated by NMSA 1978, § 37–1–23).

In *Hydro Conduit*, we remarked: "[T]he common law now recognizes a constitutionally valid statutory imposition of sovereign immunity, and such immunity must be honored by the courts where the legislature has so mandated." 110 N.M. at 177–78 n. 2, 793 P.2d at 859–60 n. 2. TCMHP and the Trial Lawyers insist that the legislature has not imposed sovereign immunity for punitive damages in breach-of-contract actions. They point out that, on the contrary, Section 37–1–23 (Repl.Pamp.1990)—which grants immunity to the state in actions based on contract, except for actions based on a valid written contract—is completely silent on the question of the state's liability or nonliability for punitive damages in such actions. This contrasts rather starkly with the express grant of immunity to the state from liability for punitive damages in an action for a tort for which immunity has been waived under the Tort Claims Act. *See* NMSA 1978, § 41–4–19(B) (Repl.Pamp.1989).[3] This, according to TCMHP and the Trial Lawyers, demonstrates either or both of two propositions: First, that the legislature, by its silence on punitive damages when it reinstated sovereign immunity for actions in contract (except where based on valid written contracts), expressly intended not to waive immunity for punitive damages in such actions; second, that the "common law" as it exists after our abolition in *Hicks* of the doctrine of sovereign immunity dictates that such liability may be imposed when the state breaches a contract, in the same way that any other party may be held liable for punitive damages when that party's breach is malicious, willful, reckless, wanton, grossly negligent, fraudulent, or in bad faith. *See, e.g., Romero v. Mervyn's*, 109 N.M. 249, 255, 784 P.2d 992, 998 (1989); SCRA 1986, 13–1827 (Repl.Pamp.1991) (Uniform Jury Instruction on punitive damages).

As for the first proposition, the Trial Lawyers' analysis, despite its excellence, is somewhat self-contradictory. Amicus clearly relies on this proposition (that the legislature intended to waive immunity for punitive damages in contract actions), saying: "Under this cardinal principle of statu-

---

**3.** Section 41–4–19(B) provides: "No judgment against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act shall include an award for exemplary or punitive damages or for interest prior to judgment."

tory construction [that where a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute is significant to show a different intention existed, citing *Richerson v. Jones,* 551 F.2d 918, 928 (3d Cir.1977) ], the *Legislature's intent* to subject the State to common law rules of damages in common law contract actions to which statutory immunity was waived could hardly have been more clearly signalled." (Emphasis added.) And again: "Until the Legislature amends the statute to bar punitive damages in contract actions, * * * this Court should honor the *Legislative determination* that, unlike tort cases, the determination of the damages available in contract actions against the state shall be controlled by the same principles applicable to all other persons who breach contracts in New Mexico." (Emphasis added.)

And yet the Trial Lawyers' brief cites and even relies on a chapter by Professor Laurence H. Tribe, entitled "Construing the Sounds of Congressional and Constitutional Silence," in *Constitutional Choices* 29–44 (1985), for the proposition that giving positive legal effect to bare legislative silences is to be assiduously avoided because "insofar as a law's claim to obedience hinges on that law's *promulgation* pursuant to agreed-upon processes for the making of laws * * * those processes do not include *failing* to enact a legal measure." *Id.* at 30.

We agree with Professor Tribe that our legislature's silence on punitive damages in Section 37–1–23 cannot be read as expressing an intention to waive immunity for punitive damages in contract actions, even though in the same act (1976 N.M. Laws, Chapter 58 (2d Session)) the legislature, dealing with the major subject of the legislation (tort claims against the state), expressly granted immunity for punitive damages in tort cases. The "cardinal principle" of statutory construction relied on by the Trial Lawyers is just that—a principle to assist in determining legislative intent when the intent is otherwise unclear. We find no intent one way or the other on the subject of punitive damages in contract actions. Whether by legislative drafting oversight or otherwise, the legislature simply failed to express its will on this subject.

On the second of TCMHP and the Trial Lawyers' two propositions—that the common law since *Hicks* authorizes imposition of punitive damages against the state in the same way that other parties breaching their contracts may be held liable for such damages—we cannot find in *Hicks*'s abolition of sovereign immunity a common law mandate that the state may be assessed punitive damages in contract actions. The "common law," like the relevant statute, is silent on the subject; and the issue is open for decision by this Court, applying what we believe to be the relevant policy considerations dictating a choice for or against the imposition of such liability.

The term "common law" has two meanings—a technical one, with historical and statutory roots; and a more general, popular meaning—a shorthand expression denoting the courts' decisional law as developed in times both ancient and recent. The technical meaning denotes the body of law adopted in this state by NMSA 1978, Section 38–1–3 (Repl.Pamp.1987), and refers generally to the law of England, both statutory and decisional, as developed by Parliament and the courts as of 1776 and incorporated into New Mexico law by the Territorial Legislature in 1876. 1876 N.M. Laws, ch. 2 (now codified as § 38–1–3); *see Boddy v. Boddy,* 77 N.M. 149, 152, 420 P.2d 301, 303 (1966) (New Mexico adopted British decisions and nonlocal statutes "which were in force at the time of American separation from England, and made [them] binding as the rule[s] of practice and decision in the courts of this State" through § 38–1–3).

Since New Mexico's incorporation of the common law of England and the United States in Section 38–1–3, numerous court decisions have announced new rules for the decision of cases. *See, e.g., Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269 (1982) (abrogating common law rule of nonliability of tavernkeeper for sale of intoxicating liquor to inebriated customer); *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981) (abolishing judge-made rule of contributory negligence

in favor of doctrine of comparative negligence); *Vigil v. Arzola,* 102 N.M. 682, 699 P.2d 613 (Ct.App.1983) (modifying judicially created rule of employment as terminable at will), *rev'd on other grounds,* 101 N.M. 687, 687 P.2d 1038 (1984) and *overruled on other grounds, Chavez v. Manville Prods. Corp.,* 108 N.M. 643, 777 P.2d 371 (1989); *Flores v. Flores,* 84 N.M. 601, 506 P.2d 345 (Ct.App.) (departing from common law rule refusing to permit wife's action against husband for intentional tort), *cert. denied,* 84 N.M. 592, 506 P.2d 336 (1973). These and similar decisions, to the extent they do not rest on constitutional requirements, are of course always open to legislative modification; but until such legislative change they represent the rules for decision of legal disputes unless and until changed by subsequent judicial overruling or modification. Decisional law of this sort is conveniently referred to as "the common law."

To the extent that the doctrine of sovereign immunity was embraced by the common law under either of the foregoing usages of the term, it was of course abolished by this Court's decision in *Hicks.* But, as Justice Holmes observed,[4] "The common law is not a brooding omnipresence in the sky"; and our decision in *Hicks* did not transform some ethereal "body" of law by substituting, for the old rule that the state *was not* liable (for anything), a new rule that henceforth the state *would be* liable (for any type of claim, seeking any kind of relief). The new rule governing liability or nonliability on a particular claim for relief was left open, for determination in a case in which the issue might be presented and in light of considerations the deciding court might deem relevant.

This case presents the issue of the state's liability for or immunity from punitive damages for breach of contract. Resolution of that issue is not dictated by anything the legislature has said, nor by any judicial precedents decided before or after our decision in *Hicks.* Our holding in *Brown v. Village of Deming* and our statement in *Rascoe v. Town of Farmington*

are relevant, but since they may be regarded as resting (although they did not say so) at least partially on sovereign immunity principles, we do not think they are controlling. We are free to decide the issue now, based on such policy considerations as we deem pertinent.

TCMHP and its amicus articulate two powerful policy considerations that we deem pertinent, though ultimately we think they must be subordinated to other considerations. These two considerations are the strong disincentive punitive damages provide against abuse of governmental power and the corresponding positive incentive they create for accountability by government officials in the conduct and management of the programs they are entrusted to administer. TCMHP and amicus argue that the facts of this case furnish a good example of how unchecked governmental power can be abused and of the need for stimulating legislative oversight of government programs to ensure that administrators of such programs will remain responsible to legislative committees and others who must authorize and manage the funds necessary for their operation. Under this view, assessment of punitive damages will "send a message" to the legislature different in kind and degree from any message that imposition of mere compensatory damages will carry.

It was policies like these that the district judge undoubtedly had in mind when he ruled that TCMHP's claim for punitive damages could go to the jury. HED attacks Judge Herrera's statement that this was "the way the law should be" as disregarding this Court's admonition in *State ex rel. Anaya v. Scarborough,* 75 N.M. 702, 410 P.2d 732 (1966), that a judge "is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness." *Id.* at 711, 410 P.2d at 738 (quoting Benjamin N. Cardozo, *The Nature of the Judicial Process* 141 (1921)). But we do not share HED's criticism of the district judge

---

**4.** *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting) (quoted in *Stroh Brew-* *ery Co. v. Director of N.M. Dep't of Alcoholic Beverage Control,* 112 N.M. 468, 477, 816 P.2d 1090, 1099 (1991) (Montgomery, J., dissenting)).

on this score. Rather, we think that Judge Herrera, in deciding the dispute between TCMHP and HED over the recoverability of punitive damages, was fulfilling one of the most important functions of the judiciary: He was deciding an unsettled question of law, based not on his notions of beauty or goodness, but on his conception of the policies that should inform the rule of decision and its application in a particular case.

However, notwithstanding our respect for the judge's discharge of his decision-making function, we are constrained to disagree with his selection from among the competing policies that underlie the choice he was called upon to make. In a nutshell, the countervailing policies we believe must prevail are the necessity to protect public revenues unless their diversion is specifically authorized by statute, coupled with the function of punitive damages to visit *punishment* on one against whom they are assessed. These considerations are especially compelling given the legislature's determination that public revenues shall not be diverted to payment of punitive damages in tort cases.

It was the first two of these considerations that underlay this Court's ruling in *Brown,* quoted *supra,* that punitive damages are awarded to punish the guilty party and ought not to be granted against a municipality and thus penalize the taxpayers. *See also City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2758–59, 69 L.Ed.2d 616 (1981):

> Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct. Regarding retribution, it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. Thus, there is no question here of equitably distributing the losses resulting from official misconduct. Indeed, punitive dam-

ages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers. [Citations omitted.]

The Trial Lawyers attack the theory that imposing punitive damages on governmental entities only punishes innocent taxpayers as a "hackneyed rubric," but we think it is more than that. Revenues for the operation of state and local government programs are notoriously thin these days, and diversion of those revenues to punish a recalcitrant or abusive governmental agency may diminish funds available to carry out other programs that are of equal importance to the chastised program and merit no reduction in funding because of another agency's derelictions. The legislature might well wish to subject its agencies and officials to the additional accountability and prevention of abuse that would flow from exposing them to liability for punitive damages, but that is a choice the legislature has expressly disclaimed in the tort context and we do not see a sufficient reason for making the opposite choice in the context of contracts.

It is this last consideration that we think deserves more than the epithet placed on it in the Trial Lawyers' brief: "mindless symmetry" between the rule applicable in tort cases and that which should apply in contract cases. That there is, or should be, "symmetry" between the two rules strikes us as self-evident. As the Trial Lawyers recognize, "this Court has noted that '[t]he courts of New Mexico do not distinguish between tort and contract in the application of punitive damages.' *Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985)." Similarly, although we have held that the application of punitive damages in contract cases does not depend upon characterization of the breaching conduct as an independent tort, *see Romero v. Mervyn's,* 109 N.M. at 257, 784 P.2d at 1000, it re-

mains true that the conduct for which punitive damages may be recovered in a contract case shares many, if not all, of the qualities for which similar conduct will permit imposition of punitive damages in a tort case. *See Brown v. Coates,* 253 F.2d 36, 39 (D.C.Cir.1958) ("[W]here a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust punitive damages may be assessed.").

The policies that shape development of the "common law"—*i.e.,* the decisional law enunciated by courts in the absence of specific legislative rules—derive from many sources: the background and experience of the judges who formulate the decisions, applicable or analogous policies established in previous cases, and legislatively ordained precepts applied to closely related, though not identical, legal settings—to name a few. *See, e.g., Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970) ("[An] appreciation of the broader role played by legislation in the development of the law reflects the practices of common-law courts from the most ancient times * * *. '[M]uch of what is ordinarily regarded as "common law" finds its source in legislative enactment.' ") (quoting Landis, *Statutes and the Sources of Law,* in *Harvard Legal Essays* 213, 214 (1934)). In the present setting, a breach-of-contract claim for which punitive damages are sought, we cannot ignore the legislative declaration that such damages may not be recovered in the closely related setting of punitive damages for egregious conduct in tort cases. What sense would it make to have one rule disallowing punitive damages for, say, malicious conduct in committing a tort, and the opposite rule for the same or similar conduct in breaching a contract? We think that such a juxtaposition of the operative legal rules would be nonsensical,[5] and we decline the invitation to adopt it.

We therefore hold that punitive damages are not recoverable from a governmental entity which is liable for breach of contract.

### III.

We take up next HED's challenges to the trial court's award of compensatory damages. As noted previously, that award consists of two parts: an amount ($250,000) to compensate for TCMHP's "loss in value" as a nonprofit corporation providing mental health services, and an amount ($27,000) to compensate TCMHP for its obligation to reimburse former employees and board members for the services they provided in winding up the contract with HED—the so-called "termination management" damages. We discuss each of these components of the compensatory-damage award separately.

### A.

The trial court instructed the jury that, if it found in TCMHP's favor on the claim for breach of contract, it could award damages for "the loss of the value of the corporation caused by the termination and the actions of [HED] surrounding the termination." There is nothing in New Mexico law as it presently stands that authorizes such an award. The general rule for the measure of damages in a breach-of-contract action permits the nonbreaching party to recover the loss in value of the performance promised by the breaching party, less any cost or other loss that the nonbreaching party has avoided by not having to perform. *See, e.g., Louis Lyster, Gen. Contractor, Inc. v. Town of Las Vegas,* 75 N.M. 427, 430, 405 P.2d 665, 667–68 (1965) (proper measure of damages is difference between contract price and cost to plaintiff of having another complete the work); *Restatement (Second) of Contracts* § 347(a) & (c) (1981) [hereinafter *Restatement* ]. In addition to these "general" damages, the nonbreaching party may in some circumstances be entitled to recover

---

**5.** *See Parks v. City of Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989) ("There is advantage in having a similar rule for tort and contract * * *. [C]onsidering the nature and purpose of

punitive damages, there is no logical reason to protect a tortfeasor more than a person who breaches a contract.").

consequential or "special" damages. *Wall v. Pate,* 104 N.M. 1, 2, 715 P.2d 449, 450 (1986); *Restatement* § 347(b) & comment c. Following the rule of *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng.Rep. 145 (1854), the courts have "freely translated the rule of *Hadley* to mean that special damages may be recovered if the loss was foreseeable by the breaching party at the time of contracting." *Wall,* 104 N.M. at 2, 715 P.2d at 450 (citing Dan B. Dobbs, *Handbook on the Law of Remedies* § 12.3, at 804 (1973)); *see Restatement* § 351(1) (damages not recoverable for loss that breaching party did not have reason to foresee as probable result of the breach when contract was made).

No issue of whether HED could reasonably have foreseen, at the time the contract was entered into, that a breach would cause the complete destruction (which is how the claim for loss in value was argued) was given to the jury,[6] nor was the jury otherwise instructed on how to determine the claimed loss in value. In fact, the record is totally bereft of any evidence to establish how such a loss might be quantified. In closing argument to the jury, counsel for TCMHP simply requested that the jury award $250,000 for this item of damages, stating that it represented a "very small percentage" of the 1990 value of Valencia Counseling, the corporation that had succeeded TCMHP as the mental-health services provider in Valencia and Torrance Counties. That 1990 value—which was the *gross* value of Valencia Counseling's total assets, not its net worth (*i.e.,* assets *minus* liabilities)—was $1.5 million. Neither TCMHP's brief, nor its jury argument, nor—most importantly—the evidence, explains or explained how to relate the 1990 gross asset value of another corporation, with different assets, contracts, client base, etc., to the 1981 value of TCMHP. The leap from $1.5 million in the one case to $250,000 in the other is completely unsupported.

We do not hold that "loss in value" to the nonbreaching party may never be a proper item of special or consequential damages flowing from a breach of contract. Though there is scant authority to support such a measure of damages, a few courts seem to have recognized that a party's loss in value for the other contracting party's breach may, if it was foreseeable by the parties as a reasonably likely consequence of a breach, be compensable. *See, e.g., Hydraform Prods. Corp. v. American Steel & Aluminum Corp.,* 127 N.H. 187, 498 A.2d 339, 346 (1985) (dictum) ("As a general rule, loss in the value of a business as a going concern, or loss in the value of its good will, may be recovered as an element of consequential damages."); *R.E.B., Inc. v. Ralston Purina Co.,* 525 F.2d 749, 755 (10th Cir.1975) (in breach of warranty case, plaintiff's diminished value recoverable but not to extent duplicated lost profits); *American Anodco, Inc. v. Reynolds Metals Co.,* 743 F.2d 417, 423-24 (6th Cir. 1984) (recovery for loss in value denied where duplicative of recovery for loss of profits). Certainly TCMHP's cases [7] do not support this measure of damages in a breach-of-contract case, since they are all cases prescribing elements of damages to a victim of a tort.

We hold that the evidence was insufficient to support a claim for loss in value of $250,000 to TCMHP flowing from HED's breach of contract.

---

**6.** The question whether HED could reasonably have anticipated a loss in value to TCMHP of a quarter-million dollars when it executed a contract, terminable without cause on thirty days written notice, for an annual amount of $161,-468, would almost seem to answer itself. In any event, the answer to this question calls for more evidence than appears on this record.

**7.** *Duke City Lumber Co. v. Terrel,* 88 N.M. 299, 302, 540 P.2d 229, 232 (1975) (destruction of business due to economic compulsion); *B.F. Goodrich Co. v. Mesabi Tire Co.,* 430 N.W.2d 180, 183-84 (Minn.1988) (destruction of business resulting from tort of misrepresentation); *Jim-Bob, Inc. v. Mehling,* 443 N.W.2d 451, 463-64 (Mich.Ct.App.1989) (loss of business, similar to loss of profits, resulting from tortious interference with contract and breach of contract), *leave for appeal denied,* 434 Mich. 865 (1990); *Jim's Hot Shot Serv., Inc. v. Continental W. Ins. Co.,* 353 N.W.2d 279, 284-85 (N.D.1984) (diminution in value of business resulting from insurer's negligence).

## B.

■ HED attacks the award of compensatory damages for the termination management services of former employees and board members on essentially two grounds: (1) It was surprised and prejudiced by the last-minute assertion of this claim by TCMHP's motion to amend the pretrial order on the first day of trial, and (2) TCMHP did not really sustain these damages because the employees' claims asserting them were "made up" long after termination of the contract and after the statute of limitations had run against them. As part of this latter ground, HED points out that the claims were authorized at a "special meeting" of TCMHP's board of directors held the week before trial in its counsel's office. While we tend to agree that the validity of the employees' claims is somewhat suspicious, given the after-the-fact way in which they were apparently reconstructed, we think the jury's determination that the claims were valid and that TCMHP was obligated to reimburse the employees rests upon substantial evidence, so we will not disturb it.

HED does not impugn the evidence that various employees and board members actually did render the claimed services in connection with TCMHP's obligation to comply with HED's directives following termination of the contract. Thus, either by virtue of an express or implied contractual obligation on HED's part to reimburse TCMHP for these post-termination services, or on the basis of an obligation in *quantum meruit* to compensate TCMHP for their reasonable value, HED was clearly responsible to pay for the amounts reasonably incurred so that its contractor, TCMHP, could reimburse the individuals who actually performed the services. We see no injustice in the jury's verdict that HED was liable for the amounts the jury determined.

■ Those amounts may have been calculated "long after" the contract's termination, but HED does not argue that they were therefore unreliable; it argues only that the individuals who incurred them did so without an expectation of reimbursement and that TCMHP had no enforceable obligation to pay them until a resolution was adopted by the board of directors at the "special meeting" the week before trial. As to the individuals' expectation, the jury determined that they did have such an expectation; and as to TCMHP's enforceable obligation, HED cannot take advantage of a statute-of-limitations defense available to TCMHP in order to avoid its (HED's) own obligation to pay for the services it undeniably directed TCMHP to perform.

■ Finally, with respect to HED's claim that the trial court abused its discretion by amending the pretrial order to permit explicit assertion of TCMHP's claim for these termination management damages, we observe first that modification of a pretrial order to prevent manifest injustice rests within the sound discretion of the trial court. *See* SCRA 1986, 1–016(E); [8] *State ex rel. State Highway Dep't v. Branchau,* 90 N.M. 496, 497, 565 P.2d 1013, 1014 (1977). We see no abuse of discretion here—in large part because HED had already been alerted to TCMHP's claims for these damages. First, the amended complaint, filed in 1985, alleged that TCMHP had "acquiesced in the termination management provisions of the contract and was consequently damaged." Next, in February 1989, in its answers to HED's interrogatories, TCMHP notified HED of its claim for damages (although greatly inflated above those fixed by the jury) for reimbursement to employees for work done in termination management. And finally, as previously noted, the pretrial order of March 20, 1990, provided that TCMHP claimed "contract damages for work performed from December 15, 1981 through

---

**8.** The version of this rule of civil procedure in effect at the time the case was filed and which therefore controls the proceedings in this action was N.M.R.Civ.P. 16, NMSA 1978 (Repl.Pamp.1980). The same standard (on the point under discussion here)—"to prevent manifest injustice"—appears in the current version of the rule, SCRA 1986, 1–016(E) (Cum.Supp.1991), effective for cases filed after January 1, 1990.

the end of the contract year * * *." While TCMHP's claim for this particular item of damages may have been buried in the host of other claims asserted in the original complaint in 1982, the amended complaint in 1985, and the pretrial order in 1990, we see no abuse of discretion in the trial court's amending the pretrial order, after the dust had settled, to specify clearly what kinds of "termination management" damages TCMHP would be permitted to prove during the trial.

The judgment awarding TCMHP $27,000 for termination management is affirmed. The judgment is reversed insofar as it awards TCMHP $1.5 million in punitive damages and $250,000 in loss of value, and the cause is remanded for entry of an amended judgment to conform with these rulings. No costs are awarded to either party.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.