DECISION
This matter is before the Court for decision on the Plaintiffs' request to pursue asset-oriented discovery based upon the assertion that they have established, after an evidentiary hearing, a prima facie showing of their eligibility for punitive damages underPalmisano v. Toth, 624 A.2d 314 (R.I. 1993). Punitive damages are statutorily authorized within the context of the instant condominium litigation upon proof that the Defendants embarked upon a "willful" course of action to evade compliance with the "Rhode Island Condominium Act," G.L. 1956 § 34-36.1-4.17.
Plaintiffs' argument focuses largely upon the conduct of Defendants' principal, Thomas R. Roos, and his efforts to enact amendments to the condominium's master declaration. In fact, Plaintiffs go so far as to pronounce that Mr. Roos "admitted at the outset of [the] hearing that his conduct in adopting the amendments was `willful' with the meaning of the Act" because: (1) he was aware that the amendments "might" be invalid when he adopted them and also aware of the risks of his chosen methodology; (2) he knew that the Fifth Amendment was not adopted unanimously and "might" be illegal yet *Page 2 
proceeded in the face of vocal opposition; (3) he acted intentionally in signing the amendments and not by accident or mistake; (4) he was informed by legal counsel in October 1997 that a court "might" prohibit him from developing the property and that the master sub-condominium structure "might" be considered to be a prohibited technique to evade the unanimity voting provision in the Act; (5) he knew that the unit owners were challenging his right to construct improvements on the Residential Area; (6) he was informed by counsel that the issues that the unit owners were raising affected his title and his theory that he had some "right to construct improvements"; and (7) IDC adopted the amendments and built the Regatta Club to preserve its own financial interest without regard to its fiduciary obligation to the unit owners. (Pls.' Post-Hr'g Mem. 2.)
Defendants IDC, Inc. and IDC Properties, Inc. (collectively, "IDC") counter as follows: (1) No defendant drafted or passed the Third Amendment; (2) the Fourth and Fifth Amendments were drafted and presented by members of the bar; (3) Plaintiffs' counsel, Hinckley, Allen Snyder LLP, had represented the original declarant, Globe Manufacturing, and the subsequent declarant, Island Development Corporation, when the Goat Island South project was sold to Thomas Roos and IDC in 1994; (4) Hinckley Allen's clients also sold condominium documents drafted by Adler, Pollack Sheehan, P.C. to Thomas Roos; (5) the Rhode Island Supreme Court issued two opinions, one with a rigorous dissent, clarifying the legal status of the property in controversy. (IDC Post-Hr'g Mem. 2-3.) *Page 3 
Defendant Thomas R. Roos maintains that he had "no special knowledge of the requirements of the Act and reasonably sought and relied upon the advice of the two most prestigious law firms in the State." (Roos Post-Hr'g Mem. 2.)
 PROCEDURAL HISTORY TRAVEL
This case's initial ascendancy to the Supreme Court occurred by way of the Defendants' appeal of this Court's finding, upon a summary judgment motion, that the Third, Fourth, and Fifth Amendments to the condominium declaration were void abinitio due to an infirm voting process. The Supreme Court affirmed the finding but announced that this Court "should have declared that title to the disputed property vested in the individual unit owners in fee simple." America Condo. Ass'n v.IDC, Inc., 844 A.2d 117, 133 (R.I. 2004) (hereinafterAmerica Condo. I). Subsequently, the Supreme Court granted reargument "in light of the importance of [the] title/ownership issue to the bar generally, as well as to the parties in this case."America Condo. Ass'n v. IDC, Inc., 870 A.2d 434, 435 (R.I. 2005) (hereinafter America Condo. II) (internal quotations omitted). The Supreme Court concluded in America Condo. II
that
 . . . those portions of airspace in the south, west, and north parcels that Defendants and their predecessors intended to be master units are common elements because no units were created therein. The land underlying these "units" likewise is part of the common elements. Because no units were validly created, no master limited common elements appurtenant to them could be created. 870 A.2d at 442.
The Supreme Court further noted that "with the benefit of hindsight" it reconsidered its earlier statement "that title to the disputed parcels vested with the individual unit owners upon expiration of the Defendants' development rights." Id. at 443. The Supreme Court *Page 4 
concluded that the master units "always were common elements subject to the exercise of said development rights, and title vested with the unit owners in common ownership from the creation of the condominium." Id.
The Plaintiffs now pursue a determination from this Court that the Defendants acted "purposefully in adopting the illegal 1994 amendments to the condominium declaration in the face of known risks," thus entitling Plaintiffs to seek punitive damages. (Pls.' Post-Hr'g Mem. 3.)
 STANDARD OF ANALYSIS
Our Supreme Court has characterized the applicable standard in Rhode Island for imposing punitive damages as a "rigorous" one satisfied only when a "defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." Palmisano, 624 A.2d at 318 (citing Davet v.Maccarone, 973 F.2d 22, 27 (1st. Cir. 1992)). The Supreme Court has further clarified that such an award "is considered an extraordinary sanction and is disfavored in the law, but will be permitted if awarded with great caution and within narrow limits."Id. (citing D'Amato v. R.I. Hosp. Trust Nat'l Bank,772 F. Supp. 1322, 1324 (D.R.I. 1991)) (discussing the statutory standard in this case — statutory "willfulness"). In order to prove punitive damages in so-called condominium cases, the plaintiff must show that the defendant engaged in a "willful course of action [in order] to evade compliance with the Rhode Island Condominium Act." Section 34-36.1-4.17. *Page 5 
 ANALYSIS OF TESTIMONIAL AND DOCUMENTARY EVIDENCE
Plaintiffs first presented the testimony of Stanley Kanter, a real estate attorney associated with the firm of Adler, Pollack Sheehan for the past thirty-nine years. Mr. Kanter believed that during the year 1994, his firm represented Globe Manufacturing and he did not know what relationship Thomas Roos had to the company at that time. (Tr. 6, July 20, 2007.) Although Attorney Kanter verified that Exhibit 3 was a fax transmission bearing, in part, his handwritten notes, he could not identify either the author or the recipient of the original transmission.Id. Mr. Kanter recalled that Exhibit 3 "related to" Goat Island, but he did not know which "issue" it purported to address. (Tr. 7, July 20, 2007.) His affixed notations are, on the first page of Exhibit 3:
 1) JRM INPUT
 2) WHAT OF DEV. UNIT #1?
 3) WHERE IS `GAME PLAN'? STK 3/11/94
On the second page of Exhibit 3, the witness wrote, "Q. WHAT OF ROOS' GAME PLAN?"
On December 2, 1994, Attorney Kanter received a letter (Ex. 6) from Attorney Timothy More at Edwards Angel indicating that Mr. More was writing "at Tom Roos' request . . . to ask whether [Mr. Kanter] considered the applicability of Section 34-36.1-2.17(d)[1]
in preparing the [referenced] Third Amendment." *Page 6 
Mr. Kanter replied to the foregoing by way of letter dated December 5, 1994 (Ex. 8), in which he stated that in mid-March 1994, Mr. Roos was present at a meeting during which the requirements for amending the Master Declaration were discussed. Additionally, the attendees (Kanter, Roos, Larry Walsh, and Attorney Turner Scott) discussed "the realities of obtaining various approvals from both the City of Newport as well as the Unit Owners" and "the requirements for amending the Master Declaration in light of those realities." (Ex. 8.) Mr. Kanter wrote that he further advised that:
 . . . both the Master Declaration and the Statute could be subject to varying interpretations as to the consent that would be required to extend the Development Rights time period, which could easily subject the Declarant or the Master Association to litigation by Unit Owners dissatisfied with any vote to extend such time period. The parties noted that, if the path to obtain unanimous consent was followed, it would be highly unlikely that the Declarant could obtain the consent of all of the approximately eighty-five Unit Owners and that, therefore, as above, an aggressive posture was appropriate. (Ex. 8) (emphasis added).
Mr. Kanter agreed with Attorney William Grimm, his questioner on direct, that the "advice reflected in Exhibit 8 was given by Adler, Pollack Sheehan to Mr. Roos on or about March 22, 1994." (Tr. 10, July 20, 2007.) *Page 7 
When cross-examined by Mr. Roos, proceeding pro se, Mr. Kanter acknowledged that he could not recall: (1) who drafted the provisions of the Goat Island South Declaration "including the bylaw provision for amending [the] instrument" (Tr. 11, July 20, 2007); (2) whether or not Adler, Pollack Sheehan drafted the declaration recorded in 1988 (Tr. 11, July 20, 2007); (3) who drafted the Third Amendment to the Goat Island South Declaration (Tr. 11, July 20, 2007); (4) whether Adler, Pollack Sheehan was representing Island Development Corp. from 1992 to 1994 (Tr. 12, July 20, 2007); (5) whether he (Mr. Kanter) negotiated a purchase and sales agreement for a sale of Goat Island real estate from Island Development Corp. to Mr. Roos (Tr. 19, July 20, 2007); or (6) whether such a transfer occurred (Tr. 19, July 20, 2007).
The evidenced furnished by and through Mr. Kanter establishes that Mr. Roos was actively seeking the advice of counsel with a view towards successfully completing an enormous, costly, and complicated transaction. Mr. Kanter himself warned that the Master Declaration and Condominium Statute "could be subject to varying interpretations." (Ex. 8.) Indeed, our Supreme Court's decision inAmerica Condo. I is proof positive of that very fact. Although the Supreme Court upheld this Court's finding that "the Third, Fourth, and Fifth Amendments were void ab initio and that the declarant's development rights had expired after December 31, 1994," the dissenting justice regarded the impact of the majority's holding as "confiscatory." America Condo. I, 844 A.2d at 142
(Flanders, J., dissenting). Justice Flanders wrote that "[g]iven the multimillion-dollar value of the Newport Regatta Club alone, this unprecedented judicially mandated forfeiture, condemnation, and transfer of property to people who are *Page 8 
not entitled to it, and without payment of any just compensation to IDC, the rightful owner, was not an appropriate remedy in this case." Id. at 147 (Flanders, J., dissenting). Justice Flanders also forecast that, as a result of the majority ruling, condominium developers and consumers alike would be "cast adrift on a dark and stormy ocean of doubt and uncertainty." Id.
Upon reargument in America Condo. II, the Supreme Court, in conclusion, stated the following:
 With the benefit of hindsight, we reconsider our statement in America Condominium I that title to the disputed parcels vested in the individual unit owners upon expiration of the defendants' development rights. These master units, so-called, always were common elements, subject to the exercise of said development rights, and title rested with the unit owners in common ownership from the creation of the condominium. 870 A.2d at 443.
Thus, it is evident that Mr. Kanter's observation that the master declaration and applicable law were subject to "varying interpretations" was prophetic. There is no evidence whatsoever in this portion of the presentation that Mr. Roos, in any way, acted in a willful manner to subvert the requirements of the condominium chapter.
In fact, in Mr. Roos' own testimony, which followed the foregoing, he consistently and repeatedly testified that he relied upon his attorneys in every regard with respect to the document preparation, execution and recordation. It is unthinkable to this Court that Mr. Roos, or any similarly situated businessperson, would expend fees for the advice of accomplished and experienced attorneys, in a highly specialized area of the law, and not heed such advice and rely upon counsels' authorship of the pertinent documents. When *Page 9 
asked about the procurement of unanimous consent, Mr. Roos responded: "I didn't have any idea of the mechanical logistics of amending the Declaration. I did whatever you and Adler, Pollack told me to do." (Tr. 41, July 20, 2007.) He explained that he had "no idea that there was any provision within a Third Amendment" until post-acquisition of the property (Tr. 42, July 20, 2007) when he was informed by Attorney More that "the procedures followed had not been properly followed in accordance with Rhode Island law." (Tr. 44, July 20, 2007.) After this disclosure and upon the advice of Attorney More, Mr. Roos "was induced into holding another meeting at which the Fourth Amendment was adopted and recorded in accordance with the procedures that Mr. More felt were in conformance with the Rhode Island Statute." (Tr. 44, July 20, 2007.) Likewise, Mr. Roos signed the Fifth Amendment, a document he neither prepared nor recorded, on advice of counsel. (Tr. 53-54, July 20, 2007.) At that time, Mr. Roos believed that there was "unanimous consent of the master units" although he recognized that "some individual unit owners were unhappy." (Tr. 55-56, July 20, 2007.) He voted on the Fifth Amendment "in good faith" and without any attorney or advisor informing him it was "likely illegal or void." (Tr. 27-28, Sept. 17, 2007.)
Mr. Roos' account of his seeking of and reliance upon legal advice is confirmed within the testimony of Attorney Timothy More, a real estate specialist of thirty-five years who took part in modifying the original condominium act, "before it was adopted by the Rhode Island General Assembly." (Tr. 3, Jan. 9, 2009.) While a partner at Edwards Angell in 1994 and 1995, Mr. More had "occasion to provide legal advice to a corporation known as IDC." (Tr. 3, Jan. 9, 2009.) It was Mr. Roos who approached *Page 10 
More's partner, Chip Rogers, due to Mr. Roos' concern about "his ability to create and develop the last major piece of property down at Goat Island, which was called the Reserved Area. . . ." (Tr. 5, Jan. 9, 2009.) Mr. More then undertook a review of the First Amended Reserved Condominium Declaration as well as the First, Second, and Third Amendments to the Declaration and "at some point in the process, the Fourth Amendment as well." (Tr. 5, Jan. 9, 2009.)
When Mr. More announced his concern to Mr. Roos regarding the two-thirds vote approving the Third Amendment, Mr. Roos authorized Mr. More to write to Attorney Kanter about the perceived problem. (Tr. 8-9, Jan. 9, 2009.) Mr. More then wrote to Mr. Kanter expressing his and the title company's "belief" that the extension of the declarant's rights under the Master Declaration required unanimous consent of all unit owners. (Ex. 6.) It was Mr. More's opinion that the "Third, Fourth, and Fifth Amendment provided very little in the way of benefits to the declarant" but the Sixth Amendment was "materially different" in that "the declarant had a right to do on its [sic] own initiative without the approval of . . . any of the unit owners." (Tr. 33-35, Jan. 9, 2009.) In any event, the entire examination of Attorney More reveals repeated instances of Mr. Roos' inquiries of various attorneys and his exchange of ideas with those attorneys. This very Court was compelled to observe that the questioning of Mr. More served to illuminate the complexity of the situation, reinforcing Mr. Roos' numerous efforts and statements displaying his concerns. The Court observed that Mr. Roos accorded a colossal amount of detailed attention to issues upon which even the lawyers could not agree. (Tr. 18-19, Feb. 6, 2009.) *Page 11 
Attorney More is, by far, in a superior position to provide evidence from which one can deduce Mr. Roos' state of mind at times pertinent. With regard to the pivotal issue of willfulness, the following portions of Mr. More's testimony are particularly significant: (1) he alerted Mr. Roos to a statutory concern of which Mr. Roos was previously unaware (Tr. 7, Mar. 3, 2009); (2) Mr. Roos was "not aware of the issue of needing 100% approval" (Tr. 7-8, Mar. 20, 2009); (3) Mr. Roos was advised that "if the master units were the units of Goat Island South Condominiums and there were five master units at the time, five approving votes would constitute unanimity" (Tr. 16, Mar. 3, 2009); (4) he opined to Mr. Kanter that "according to the GIS Declaration, the sub-associations cast the vote of their single master unit through their board member representatives as a single vote of a single unit"[2] (Tr. 19, Mar. 3, 2009); (5) there was no attempt to circumvent the Condominium Act by adopting the Fifth Amendment (Tr. 25, Mar. 3, 2009); (6) the procedures used to adopt the Fifth Amendment were a reasonable and fair interpretation of the condominium documents and the Rhode Island statute regarding the counting of the necessary votes (Tr. 21, Mar. 3, 2009); and (7) Mr. More was unaware of any knowledge of any claim disputing Mr. Roos' ownership of any of the master units (Tr. 36, Mar. 3, 2009).
This portion of the record compels the conclusion that Mr. Roos continuously sought out legal advice during the entire transactional process, identifying and inquiring about perceived nuances in the language of the documents. It was his $26.5 million at *Page 12 
stake, [3] and not surprisingly, his approach along the way was studied, assiduous and inquisitive of his professional advisors' thoughts and opinions.
The Plaintiffs' assertion that Mr. Roos "micromanaged" and "directed" his counsel implies that his highly regarded attorneys with decades of experience discarded their professional independent judgment — and apparently their ethics as well — relegating themselves to mere puppets over whom Mr. Roos was the master. The Court outright rejects this suggestion along with the tandem characterization of Mr. Roos as a reckless rogue, rushing headlong and unprincipled through these complicated transactions without a nod to the applicable law.
The Defendants aptly capture the Plaintiffs' stance: "the plaintiffs urge this Court to impose on Roos, a non-attorney, who listened to the advice of respected attorneys, who had the ultimate responsibility of analyzing the voting procedures, with a superior knowledge of such that he should have disregarded the advice of his counsel and made an independent determination that these provisions were unlawful. But, the plaintiffs want the Court to go even further and find that the defendants should have known that what they purchased was not what it was represented to be — that the potential development rights were illusory and the three vacant parcels were master common elements from their inception." (IDC Post-Hr'g Mem. 19-20.) *Page 13 
Our Supreme Court has articulated that the "nature of punitive or exemplary damages is twofold: to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar extreme conduct." Palmisano,624 A.2d at 317-18 (citing City of Newport v. Fact Concerts,Inc., 453 U.S. 247, 266-67 (1981)). The within controversy invites a more tepid standard of review, i.e., whether the defendant embarked upon a "willful course of action [in order] to evade compliance with the Rhode Island Condominium Act." Section 34-36.1-4.17. The evidence presented unequivocally contravenes the conclusion that Mr. Roos, individually or as an agent of the defendant business entities, acted with willful intent to evade compliance with the Act.
 CONCLUSION
As the Plaintiffs have failed to make a prima facie showing that the lesser hurdle of entitlement to punitive damages has been cleared, i.e. that of willful evasion of compliance, the Court denies their request to compel any of the within Defendants to respond to asset-based discovery.
Counsel shall prepare an order in conformance with this Decision.
[1] The Commissioners' Comment to § 34-36.1-2.17 states, in pertinent part:
 This section recognizes that the declaration, as the perpetual governing instrument for the condominium, may be amended by various parties at various times in the life of the project. The basic rule, stated in subsection (a), is that the declaration, including the plats and plans, may only be amended by vote of 67% of the unit owners. The section permits a larger percentage to be required by the declaration, and also recognizes that, in an entirely non-residential condominium, a smaller percentage might be appropriate.
 In addition to that basic rule, subsection (a) lists those other instances where the declaration may be amended by the declarant alone without association approval, or by the association acting through its board of directors.
[2] "[T]he individual sub-unit owners of the plaintiff condominium associations were not entitled to cast individual votes on amendments to the GIS declaration." America Condo. I,844 A.2d at 140 (Flanders, J., dissenting).
[3] Roos testified: "I didn't plan on getting any financing. I never obtained financing for any deal I have done, to obtain financing was never a concern of mine. . . . I had dreams. I had ideas. I had visions. I had long range expectations of what I would do on the property. I didn't have specific intentions of what to do with the property, but I did have long-term dreams that were goals of mine probably since I was a child." (Tr. 39-40, Jul. 20, 2007.)